SECURITIES AND EXCHANGE COMMISSION, Plaintiff, Appellee, and Securities Investor Protection Corporation, Applicant, Appellee,

v.

Harry G. MILNER, etc., et al., Defendants, Appellees, Doris L. Higgins et al., Creditors, Appellants.

No. 72–1291.

United States Court of Appeals, First Circuit.

Argued Dec. 4, 1972.

Decided Feb. 20, 1973.

---

Richard S. Bowers, Jr., Brookline, Mass., with whom Robert S. Marsh, Waltham, Mass., was on brief, for appellants.

Gordon A. Martin, Jr., Boston, Mass., with whom Martin, Morse & Wylie, Boston, Mass., David M. Roseman, and Tyler & Reynolds, Boston, Mass., were on brief, for appellee, Gordon A. Martin, Jr., Trustee of Karle R. Berglund d/b/a Colonial Investment Securities.

Theodore H. Focht, Washington, D. C., with whom Wilfred R. Caron, Washington, D. C., was on brief, for appellee Securities Investor Protection Corp.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Appellants Higgins and Landgren were employed as securities salesmen by Karle R. Berglund d/b/a Colonial Investment Securities ("Colonial"), formerly a registered broker-dealer of securities, whose business is now being liquidated by a Trustee appointed in the district court under provisions of the Securities Investor Protection Act of 1970 (the "Act"), 15 U.S.C. § 78aaa et seq. Higgins has claims against Colonial for commissions, for losses as a customer, and as a general creditor of Berglund. Landgren has a minute claim for commissions. Both appeal from the district court's order directing the Trustee, Martin, to make distribution in accordance with his first amended report and plan (the "plan").

While appellants launch a variety of attacks upon the plan, and the Act, we reach only one of them because of the failure, discussed below, to raise them appropriately in the district court. The issue we reach, and remand for further consideration, is whether the Trustee may now pay as expenses of adminis-

tration Colonial's liability to customers, and others, incurred after it [1] went into receivership.

The facts, briefly, are as follows:

On January 15, 1971, Colonial, upon petition of the SEC, was enjoined from security law violations and a Receiver,[2] James C. Donnelly, Jr., was appointed. Mr. Donnelly filed a surety bond in the amount of $50,000. In February, he petitioned the district court for leave to continue Colonial's business, on the ground that as a sale of its assets was being negotiated it would be detrimental to creditors not to preserve its assets (principally its sales force, customers, and arrangements with mutual funds). The petition was allowed, after hearing, but with limitations: business was to be limited to the solicitation of mutual fund sales, not including the sale of general securities; no funds or security certificates were to pass through Colonial except as necessary to complete existing contracts or orders; the sole purpose of continuing activity would be to preserve saleable assets; and Karle A. Berglund was to have no part in the management of the business except as necessary to consummate the sale of assets.

In spite of the court's order, Colonial, apparently without supervision and with Berglund's participation, continued to sell general securities as well as mutual funds, incurring heavy liability to customers and others.

On April 1, 1971, with court approval, assets of Colonial were sold for $70,000 to a third party free from liability. Because the Receiver was in ill health, the court on May 7, 1971, appointed Mr. Martin as co-Receiver. Mr. Donnelly has since died.

In August, 1971, the Securities Investor Protection Corporation (SIPC) applied to have Colonial liquidated under the Act. On August 6, 1971, the court ordered that Colonial's customers needed such protection, and appointed co-Receiver Martin as SIPC Trustee. The Trustee thereafter, with the court's approval, paid Colonial's customers the value of their net equities on the filing date [3] from funds advanced by SIPC, there being no "single and separate fund" assets for the purpose. See 15 U.S.C. § 78fff. The Trustee returned specifically identifiable securities to customers. From the sale proceeds and SIPC advances, he also paid fees to Donnelly and to counsel and others for services during the receivership, and the expenses of the SIPC trusteeship.

By June of 1972, the Trustee, having about $58,000 on hand from the proceeds of the sale of Colonial's assets, prepared a plan which, with later minor amendments, became the plan here in issue. He proposed to distribute the entire $58,000 "in payment of the expenses of administration of . . . Receiver James C. Donnelly." About three-quarters of this would go to customers who had transactions with the Receiver between January 15, 1971 (the date Mr. Donnelly took office) and March 31, 1971 (the date of the sale of Colonial's assets). The balance would go to salesmen for net commissions during the same period; for goods and services then received; and to reimburse SIPC for certain advances for administration. The Trustee would treat all items, including the customers' claims, as expenses of administration, hence as having priority over the claims of general creditors.[4] Nothing would be left for the latter.

---

1. While referred to for convenience as "it", Colonial was merely a name used by Berglund for his securites operations. Colonial has no legal standing separate from Berglund individually.

2. The receivership was created under the district court's general equity powers. Trusteeship under the Act did not occur until later.

3. The filing date was January 12, 1971, the date the equity receivership proceeding was commenced. See 15 U.S.C. § 78eee (b) (4) (B) (ii).

4. In the plan, the Trustee cites § 64a(1) of the Bankruptcy Act, 11 U.S.C. § 104a (1), making it clear that the purported priority status of these items rests not on the single and separate fund provisions of

Appellants' only claim of significance to this appeal is that of Miss Higgins, as a general creditor, for $25,000 or more. It derives from loans, principally to Berglund personally, which she made in 1968 and 1970. Although the plan makes no provision for the claim, the Trustee advises us that he accepts it, along with others, for consideration in the event of more assets.

Miss Higgins' claims as a customer and for commissions earned during the receivership would be substantially paid under the plan, although non-mutual fund commissions were deleted, resulting in a somewhat lesser amount than the Trustee had initially proposed. In this appeal, she does not complain about the amount of these proposed distributions.

Landgren had a commission claim for $104.65, reduced in the final plan to $93.37. He does not now complain about the proposed distribution, and has no discernible interest in this appeal.

The amended plan was approved on July 26, 1972, after two district court hearings. The first, on July 10, 1972, was preceded by written notice, formulated and mailed by court order,[5] and received by both appellants in early June. The notice, accompanied by a copy of the plan, provided for a creditors' meeting on June 20, 1972, and stated that objections to the plan were to be filed "in writing" with the district court within ten days after the June 20 meeting. Hearing on "any objections thereto which have been timely filed" was set for July 10 at 11:30 a. m. at the district court.

Miss Higgins personally attended the June 20 meeting of creditors.[6] Landgren was represented by present counsel. On June 26, she wrote the Trustee de-

tailing her general claims against Berglund and stating that it was not her "intention or desire to interfere" with the proposed plan, but wished her additional claims considered after "those of the a) customers, b) creditors, c) salesmen have been settled."

On July 10, 1972 both appellants were represented in the district court by present counsel who undertook to express disagreement with the plan. No written objections had been tendered, however, and for that reason the court declined to entertain counsel's oral objections, except those regarding the proposed deletion of commissions on nonmutual fund sales. The amended plan was filed soon after July 10, 1972, (differing from the former only by deleting general commissions and including several small claims as to which timely objections had been filed).

On July 18, 1972, appellants' counsel wrote a letter to the Trustee's counsel. Presented to the court on July 21, the objections therein were overruled after discussion between court and counsel. Distribution pursuant to the amended plan was thereafter ordered. The points raised in the July 18 letter are largely irrelevant to those raised before us; however there is an oblique reference to the sale of securities, as distinguished from mutual funds, during the receivership. Charitably it might be said that this called attention to the general issue of the Receiver's failure to comply with the court's order.

█ We think the district court was entirely warranted in declining to entertain oral objections to the plan. Even were we to ignore Higgins' uncounselled letter of June 26, 1972, which acquiesced

the Act, but on the theory that the claims against the Receiver during that period are properly expenses of administration.

5. Under 15 U.S.C. § 78fff(e) "the court may make appropriate provision for proof and enforcement of all claims against the debtor. . . ."

6. Miss Higgins who ran the general securities desk at Colonial, was represent-

ed by experienced counsel in May, 1971, when she sued Berglund on her 1968 and 1970 demands in the state court. The action was stayed upon the petition of the SIPC Trustee. Miss Higgins retained her present counsel in July, 1972. We have no reason to assume, given this background, that she was lacking in sophistication or did not know where to find counsel.

in the plan's priorities, her attorney did not later file anything in writing except the letter of July 18, 1972.[7] District courts are not required to entertain vague, unformulated protests from attorneys and clients who disregard clear and patently reasonable advance instructions to reduce their complaints to writing.

We thus decline to consider appellants' attack upon the alleged unconstitutionality of the Act. It was not raised in the district court. Counsel's oral remark that "even the question of constitutionality may be involved here" presented nothing upon which the district court might be expected to act. Only rarely do we hear constitutional arguments in the first instance. Talmanson v. United States, 386 F.2d 811, 812 (1st Cir. 1967), cert. den. 391 U.S. 907, 88 S.Ct. 1658, 20 L.Ed.2d 421 (1968). The question sought to be raised is neither so substantial nor material as to lead us to make an exception. Well before the Act, securities customers were recognized as retaining a special interest in customer property; both earlier practice and valid social and economic aims would seem to provide a rational basis for the "single and separate fund" provisions. (See § 60e of the Bankruptcy Act, 11 U.S.C. § 96(e)). Moreover, appellants' concern with the Act's constitutionality seems largely premised upon a misanalysis of the plan: e. g. their belief that the Trustee's purported authority for priority payment of customers and others for claims during the receivership stems from the Act's single and separate fund provisions. To the contrary, the Trustee asserts authority under a familiar bankruptcy provision (§ 64a(1) of the Bankruptcy Act, 11 U.S.C. § 104a(1), incorporated in the Act at 15 U.S.C. § 78fff(c)), granting priority to the "costs and expenses of administration, including the actual and necessary costs and expenses of preserving the estate."

The appellants' non-constitutional points, other than the one hereinafter mentioned, fall in an analogous category. In no meaningful sense were they raised below.

While the appellants' lack of diligence in the district court causes us to refuse to consider the constitutional and most of the legal questions which they now seek to raise, it does not warrant our by-passing one important question: namely, whether the Trustee may now pay out all the remaining property largely for receivership liabilities incurred through the apparent dereliction [8] of the Receiver.

The question was tangentially raised below; but, quite apart from that, given strong indication that a receiver may entirely have failed to carry out his duties, the court had reason to investigate on its own.

Here, not only were non-mutual fund shares sold; but other parts of the order may have been disregarded—by permitting Berglund to remain in the business and, possibly, by permitting funds and certificates to pass through Colonial. It is difficult to imagine how $43,000 of customer claims could have arisen within several months had the Receiver complied with the terms of the order and his fiduciary obligations.

The Trustee, as we understand him, does not deny that this may be so, but relies upon Reading Co. v. Brown, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968) as warranting payment as expenses of administration of claims stemming from a receiver's default. Perhaps so, although it is not immediately clear to us that that case, involving a negligent fire loss, necessarily controls these

---

7. Counsel did not follow the conventional practice of preparing objections and submitting them with a motion for permission to file late. Written objections not only focus the court's attention but in a proceeding like this, give the trustee and other creditors fair notice of matters they may wish to answer.

8. We recognize that Mr. Donnelly may have been ill and that whatever happened may not be such as to reflect personally upon him.

different facts.[9]  In any event, we are unwilling to apply *Reading*, over objection however inartful, on a record which tells us virtually nothing about the circumstances and details of the claims and the Receiver's actions.  Moreover, it would be relevant to know why action upon the Receiver's bond has not been undertaken.

██ We accordingly vacate the district court's order directing distribution in accordance with the plan.  We remand for further proceedings in the district court which will consider the appropriateness of treating customers' and other claims during the receivership as expenses of administration, and further whether recovery should be sought under the Receiver's bond.  Thereafter, the plan should be modified or not, and approved, as the district court may determine.  Our remand to the district court is not to be taken as reopening, or creating the possibility of raising, the matters disposed of in this opinion as not sufficiently presented below.

Remanded for further proceedings consistent herewith.

9.  We are not to be understood as passing upon the question one way or the other at this juncture.  We expressly leave it open for further consideration by the district court after the inquiry ordered below.