The INTERFACE GROUP, INC.,
Plaintiff, Appellant,

v.

MASSACHUSETTS PORT AUTHORITY,
Defendant, Appellee.

No. 86–1467.

United States Court of Appeals,
First Circuit.

Argued Oct. 8, 1986.
Decided March 30, 1987.

James C. Burling, with whom Richard J. Innis, Mark G. Matuschak and Hale and Dorr, Boston, Mass., were on brief, for plaintiff, appellant.

Allyn O. Kreps, William T. Drescher and Jones, Day, Reavis & Pogue, Los Angeles, Cal., on brief, for Air Transport Ass'n of America, amicus curiae.

Scott P. Lewis, with whom Thane D. Scott, Anne L. Gero, Palmer & Dodge and Richard J. Lettieri, Mass. Port Authority, Boston, Mass., were on brief, for defendant, appellee.

Before COFFIN, BREYER and TORRUELLA, Circuit Judges.

BREYER, Circuit Judge.

The Massachusetts Port Authority (Massport), which operates Logan airport, will not let the appellant, a charter airline operator called The Interface Group, Inc. (Interface), use Logan's Terminal C. Interface, believing that Massport's refusal violates the federal antitrust laws, 15 U.S.C. §§ 1, 2 (1982), and several federal aviation statutes, 49 U.S.C.App. §§ 1349(a), 1513, 2210 (1982), sued Massport in federal district court. Interface also asked the court to assume pendent jurisdiction over two state claims that parallel its antitrust claims. Mass.Gen.L. ch. 93, §§ 4, 5; ch. 93A, § 2 (1985). The district court dismissed the entire complaint for failure to state a federal claim. Fed.R.Civ.P. 12(b)(6), 631 F.Supp. 483. Interface appeals this dismissal. With one exception, we believe the district court was correct.

I.

Interface's antitrust claims amount to an imaginative, but unsuccessful, effort to dress its facts in the wrong suit of legal clothes. The facts that it asserts, in essence, are the following: (1) Interface bought two L1011 aircraft from TWA to use for charter service during the winter; (2) it leased them back to TWA for TWA's use during the peak summer season; (3) TWA promised Interface that during the winter Interface could use TWA ground services; (4) Massport allows TWA to service itself at Terminal C; (5) Massport permits two other private companies (called "fixed base operators" or "FBOs") to sell ground services at Terminal E; and (6) Massport requires all nontenant charter carriers, such as Interface, to use Terminal E; they cannot use Terminal C.

Interface asserts that Massport's policy, at least as applied in this instance, is unreasonable. Interface's basic legal problem is that it is not seeking judicial review of an unreasonable regulation under the state Administrative Procedure Act (as counsel at oral argument agreed it might have done). See Mass.Gen.L. ch. 30A, § 7 (1985). Rather, it has brought an antitrust claim. And "unreasonableness" in antitrust law has a rather special meaning. It means that the anticompetitive consequences of a particular action or arrangement outweigh its legitimate business purposes. See 7 P. Areeda, Antitrust Law ¶ 1500, at 362–63 (1986). "Anticompetitive" also has a special meaning: it refers not to actions that merely injure individual competitors, but rather to actions that harm the competitive process, Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962), a process that aims to bring consumers the benefits of lower prices, better products, and more efficient production methods. Once one recognizes these special meanings of the relevant terms, it becomes diffi-

cult, if not impossible, to see how the facts alleged in the complaint could make out a violation of the antitrust laws.

■ Interface says that Massport's requirement that it use Terminal E and the ground services provided there amounts to an unreasonable "exclusive dealing" arrangement between Massport and the FBOs, unlawful under Sherman Act § 1. But "[n]ot all exclusive dealing contracts even by a monopolist are illegal." *Smith v. Northern Michigan Hospitals, Inc.*, 703 F.2d 942, 953 (6th Cir.1983). Because the arrangements often serve legitimate business purposes, courts apply a rule of reason in deciding whether particular instances violate the Sherman Act. *See Brown v. Hansen Publications, Inc.*, 556 F.2d 969, 970–71 (9th Cir.1977) (noting that "exclusive dealing arrangements are not per se illegal" because they "may be procompetitive in purpose"); *cf. Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 58–59, 97 S.Ct. 2549, 2561–62, 53 L.Ed.2d 568 (1977) (noting that vertical restrictions are presumptively governed by the rule of reason).

Exclusive dealing arrangements may *sometimes* be found unreasonable under the antitrust laws because they may place enough outlets, or sources of supply, in the hands of a single firm (or small group of firms) to make it difficult for new, potentially competing firms to penetrate the market. *See* 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 732, at 253 (1978). To put the matter more technically, the arrangements may "foreclose" outlets or supplies to potential entrants, thereby raising entry barriers. *Cf. Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327–29, 81 S.Ct. 623, 627–29, 5 L.Ed.2d 580 (1961) (applying the stricter standard of Clayton Act § 3). Higher entry barriers make it easier for existing firms to exploit whatever power they have to raise prices above the competitive level because they have less to fear from potential new entrants. Thus, for example, one might worry about long term exclusive dealing contracts between a small group of firms making most of the nation's light bulbs and the firms that make light bulb filaments; if potential light bulb manufacturers are deterred from entering the market by a fear that they will be unable to obtain filaments, the existing light bulb manufacturers may be able to keep prices high. *Cf. Standard Oil Co. v. United States*, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949) (finding foreclosure of marketing outlets to be a § 1 violation).

The complaint before us, however, seems inadequate to raise an antitrust controversy. Certainly the kind of antitrust harm typically present in an unlawful exclusive dealing arrangement is missing here. Interface does not claim that the arrangement, by foreclosing entry into the FBO market, makes it easier for Massport to abuse its market power or more difficult for new firms to build competing airports. Nor does it allege any more exotic theory of antitrust harm. Even if we were to concoct on Interface's behalf an analogy between FBOs and dealers to which an important manufacturer assigns exclusive territories, we would not cure the deficiency, because a manufacturer is ordinarily free to decide just how many dealers it will place in any given geographic area. *See Packard Motor Car Co. v. Webster Motor Car Co.*, 243 F.2d 418 (D.C.Cir.), *cert. denied*, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957).

When there is no plausible connection between exclusive dealing and antitrust harm, courts have not hesitated to hold that dealing lawful. Thus, courts have explicitly permitted even private firms with effective monopoly control of a transportation facility to maintain exclusive dealing arrangements with even a single supplier. *See, e.g., Donovan v. Pennsylvania Co.*, 199 U.S. 279, 26 S.Ct. 91, 50 L.Ed. 192 (1905) (permitting a private railroad company to enter into an exclusive dealing arrangement with a single taxi company for provision of taxi services at the Chicago railroad station); *Export Liquor Sales, Inc. v. Ammex Warehouse Corp.*, 426 F.2d 251 (6th Cir.1970), *cert. denied*, 400 U.S. 1000, 91 S.Ct. 460, 27 L.Ed.2d 451 (1971) (dismissing a § 2 claim challenging an exclusive lease between the Detroit & Canada Tunnel Corporation and a company selling

duty-free liquor). We have found no case invalidating exclusive dealing arrangements in which the potential harm to competition (in the word's special antitrust sense) appeared as remote as a reasonable reading of the complaint suggests here. The cases Interface cites involved exclusive dealing arrangements with more obviously anticompetitive consequences. *See United States v. General Motors Corp.*, 384 U.S. 127, 144–45, 86 S.Ct. 1321, 1330–31, 16 L.Ed.2d 415 (1966) (finding a § 1 violation when manufacturer elicited agreements from dealers not to do business with discounters); *New York Airlines, Inc. v. Dukes County*, 623 F.Supp. 1435, 1450–51 (D.Mass.1985) (finding a § 1 claim when plaintiff was excluded altogether from defendant's airport because of a threat by a competing airline to discontinue existing service).

The fact that Massport is a public rather than a private body makes any risk to competition yet more remote. Unlike a *private* owner, Massport does not directly profit from its ownership of Logan. *See Opinion of the Justices*, 334 Mass. 721, 734, 136 N.E.2d 223, 231 (1956). It therefore has no economic motive to protect its market power in the airport operating business or to enter into anticompetitive arrangements. Given the absence of plausible allegations suggesting that the case raises the kinds of antitrust concerns typically present in unlawful exclusive dealing cases, and given the complaint's failure to raise any novel theory of illegality, the complaint simply does not state an antitrust exclusive dealing claim. *See Donovan, supra; Export Liquor Sales, supra; cf. Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1109–10 (7th Cir.1984) ("[T]he complaint does not in any way set forth facts to support the conclusion that [the replacement of a firm in an exclusive dealing contract] had any anticompetitive effect."), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985).

■ Interface's alternative antitrust theory suffers from similar problems. Interface says that Massport's failure to make Terminal C ground facilities available to it

violates Sherman Act § 2's prohibition of monopolization. It argues that because Massport has a monopoly of the airport business, it must make "essential facilities" available to anyone who wishes to use them. This view of the essential facilities doctrine, however, considerably overstates its scope. The doctrine aims to prevent a firm with monopoly power from extending that power "from one stage of production to another, and from one market into another." *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1132 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). When a monopolist denies a competitor access to a facility it needs to compete, the denial is at least arguably "unreasonable" or "exclusionary" in the antitrust sense, and therefore unlawful. *See, e.g., Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (finding a § 2 violation when Otter Tail refused to permit competing municipal power companies to use its electrical distribution system); *cf. United States v. Terminal R.R. Association*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912) (holding that an association of railroads that controlled all the terminals in St. Louis could not exclude their competitors from those facilities). But it is difficult to see how denying a facility to one who, like Interface, is not an actual or potential competitor could enhance or reinforce the monopolist's market power. *See* P. Areeda & H. Hovenkamp, Antitrust Law ¶¶ 736.2d, 736.2e (Supp.1986). If this is so in the case of a private monopolist, it is still more certain when the monopolist is a public agency, for the agency has neither the motive nor the need to solidify its monopoly position. Thus, we do not see how the facts alleged could make out the actual or potential injury to the competitive process necessary to show a violation of Sherman Act § 2.

■ Interface fails to state a claim under Sherman Act § 1 or § 2 for an alternative reason: in our view, Massport is immune from antitrust liability under the state action doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). *Parker* established that the anti-

trust laws do not reach restraints of trade imposed by the *state,* rather than private parties. In *E.W. Wiggins Airways, Inc. v. Massachusetts Port Authority,* 362 F.2d 52 (1st Cir.), *cert. denied,* 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966), this court found that Massport's decision to lease space to only *one* FBO was not subject to antitrust scrutiny because "it was acting as an instrumentality or agency of the state." *Id.* at 55.

We realize that since our decision in *Wiggins,* the Supreme Court has tightened the immunity rules for certain kinds of state instrumentalities, namely municipalities, *see Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), but Massport continues to qualify for immunity. Even if Massport is not the "state" itself, it at least is equivalent to a municipality. The Supreme Judicial Court has explicitly recognized that Massport resembles a municipal corporation and that Massport "is in no sense a private or business corporation." *Opinion of the Justices,* 334 Mass. at 734, 136 N.E.2d at 231. Massport also possesses such typical governmental attributes as the power of eminent domain, rulemaking authority, bonding authority, and tax exempt status. *See* Mass.Gen.L.Ann. ch. 91 App., §§ 1–3, 1–4, 1–8, 1–9, 1–17; *cf. Commuter Transportation Systems, Inc. v. Hillsborough County Aviation Authority,* 801 F.2d 1286 (11th Cir.1986) (citing these powers as reasons for finding that the Authority was akin to a municipality).

Moreover, Massport satisfies *Lafayette*'s rule that a municipality is immune only when it acts pursuant to a "clearly articulated and affirmatively expressed" state policy. *Lafayette,* 435 U.S. at 410, 98 S.Ct. at 1135. Massachusetts has authorized Massport "to contract with any person ... desiring the use of any part of [Logan Airport] ... to fix the terms, conditions, rents and rates or charges for such use ...," Mass.Gen.L.Ann. ch. 91 App., § 1–14, and to "establish rules and regulations for the use of [Logan]." *Id.* at § 1–3. These powers, like the rest of Massport's authorizing legislation, are to be "liberally construed to effect the purposes" of the

legislation. *Id.* at § 1–27. Setting policies that govern which airlines are to use which terminals, where and how they are to be serviced, and whether or when they can taxi from one terminal to another, lies close to the heart of Massport's basic purpose. Thus, the state has *clearly* indicated that Massport may engage in the activities here in question. *See Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 42–44, 105 S.Ct. 1713, 1718–19, 85 L.Ed.2d 24 (1985).

Of course, one might argue to the contrary that technically Massachusetts did not delegate to Massport the authority to make *unreasonable* rules, and Interface has alleged that Massport's rules are "unreasonable" (in the ordinary, not the special antitrust, sense of the word). But this argument does not persuade us that Massport loses its antitrust immunity. If Massport's lawful activity in this area falls outside the Sherman Act, the fact that the activity may be (not obviously) unlawful under state law (for reasons having nothing to do with antitrust) cannot make a legal difference for the purposes of antitrust immunity. To hold otherwise would impose the antitrust laws' treble damage liability upon agencies that may have done no more than to misjudge difficult questions of state law or make administrative errors having nothing to do with antitrust policy. It would force antitrust courts to review state administrative law disputes.

We should not lightly assume that *Lafayette*'s authorization requirement dictates transformation of state administrative review into a federal antitrust job. Yet that would be the consequence of making antitrust liability depend on an undiscriminating and mechanical demand for "authority" in the full administrative law sense.

P. Areeda & H. Hovenkamp, *supra,* ¶ 212.-3, at 104. A Congress that intended to permit states to authorize potentially anticompetitive activity would not have left outside that area of autonomy conduct involving "'ordinary' errors or abuses in the administration of powers conferred by the state." *Llewellyn v. Crothers,* 765 F.2d 769, 774 (9th Cir.1985) (quoting Areeda,

"Antitrust Immunity for 'State Action' After *Lafayette*," 95 Harv.L.Rev. 435, 453 (1981)). State administrative process is available to correct this kind of mistake. *See id.; Scott v. Sioux City*, 736 F.2d 1207, 1215–16 (8th Cir.1984), *cert. denied*, 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985).

In sum, *Wiggins* remains good law. And even were Massport not immune, the complaint would fail to state an antitrust claim. The district court therefore properly dismissed Interface's antitrust claims.

## II.

■ Interface also claims that Massport violated three federal aviation statutes, 49 U.S.C.App. §§ 1349(a), 1513, and 2210. The district court dismissed these claims on the ground that the government alone has the right to enforce these statutes; the statutes do not provide private parties such as Interface with a "private right of action." In two instances we agree with the district court; in one instance (49 U.S.C. App. § 1513) we do not.

## A.

In *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court set forth criteria to help courts decide whether Congress meant to create a private right of action when it enacted a statute that is silent on the subject. *See N.A.A.C.P. v. Pierce*, 817 F.2d 149, at 153 (1st Cir. March 19, 1987). The Supreme Court said that we should ask:

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted" ...—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? ... And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropri-

ate to infer a cause of action based solely on federal law?

*Id.* at 78, 95 S.Ct. at 2088 (citations omitted). We first ask these questions about 49 U.S.C.App. § 1349(a), which provides in relevant part:

No federal funds ... shall be expended ... for the acquisition, establishment, construction, alteration, repair, maintenance, or operation of any landing area, or for the acquisition, establishment, construction, maintenance, or operation of air navigation facilities thereon, except upon written recommendation and certification by the Secretary of Transportation that such landing area or facility is reasonably necessary for use in air commerce or in the interests of national defense.

... There shall be no exclusive right for the use of any landing area or air navigation facility upon which Federal funds have been expended.

The statutory language weighs slightly against appellants with respect to *Cort*'s "especial benefit" test. We concede that the language about "exclusive rights," taken alone, supports the view that the statute (or at least the last sentence) aims at the "especial benefit" of those who operate planes as contrasted with those who fly as passengers in them. But the statutory provision taken as a whole suggests that Congress sought to benefit the public at large, not carriers in particular. *See Montauk-Caribbean Airways, Inc. v. Hope*, 784 F.2d 91, 97 (2d Cir.1986); *New York Airlines*, 623 F.Supp. at 1448; *Hill Aircraft & Leasing Corp. v. Fulton County*, 561 F.Supp. 667, 673 (N.D.Ga.1982), *aff'd without opinion*, 729 F.2d 1467 (11th Cir.1984).

The evidence weighs more strongly against appellant with respect to *Cort*'s second, "legislative intent," inquiry. There is nothing in the legislative history that suggests any intent to create a private right of action. At the same time, the statute as a whole provides an administrative and judicial enforcement scheme that suggests at least some Congressional wish for an element of administrative expertise at the enforcement stage, an expertise that

tends to be lost when private parties can enforce the statute directly in federal court. This latter view is reinforced by the reference to the Secretary of Transportation in the first quoted sentence and by the fact that Congress created an express private right of right of action elsewhere in related provisions of the statute, but not here. *See* 49 U.S.C.App. § 1487 (1982) (creating a private right of action for violations of § 1371(a) of the same Act). Thus, if anything, the statute manifests legislative intent to deny, not to grant, a private right of action.

Although the third and fourth *Cort* factors better serve Interface's claim, these are minor factors that, here, cannot make a legal difference. Indeed, the Supreme court has said that a private right of action should not be implied on the basis of these factors alone. *See Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 23, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2488–89, 61 L.Ed.2d 82 (1979). We therefore agree with those courts that have held that § 1349(a) does not create a private right of action. *See Pumpkin Air, Inc. v. Addison,* 608 F.Supp. 787, 794 (N.D.Tex.1985); *IFC Aviation, Inc. v. Massachusetts Port Authority,* No. 84–1945–T, slip op. (D.Mass. May 22, 1985); *Guthrie v. Genesee County,* 494 F.Supp. 950, 960 (W.D.N.Y.1980). The sole case holding the contrary, *Niswonger v. American Aviation, Inc.,* 411 F.Supp. 763 (E.D.Tenn.1975), *aff'd. mem.* 529 F.2d 526 (6th Cir.1976), was decided before the Supreme Court decision in *Cort v. Ash.*

### B.

■ Interface claims that Massport has violated 49 U.S.C.App. § 2210. That provision reads as follows:

As a condition precedent to approval of an airport development project ... the Secretary shall receive assurances ... that—

(1) ... (A) each air carrier using such airport ... shall be subject to such nondiscriminatory and substantially compa-rable rates, fees, rentals, and other charges and such nondiscriminatory and substantially comparable rules, regulations, and conditions as are applicable to all such air carriers which make similar use of such airport facilities, subject to reasonable classifications such as tenants or nontenants ..., and (C) each air carrier using such airport shall have the right to service itself or to use any fixed-base operator that is authorized to serve any such air carrier at such airport....

We see two relevant differences between this statute and 49 U.S.C.App. § 1349(a). First, the statute's language suggests more strongly that it was "enacted" for the "especial benefit" of air carriers such as Interface. Second (and conversely), the statute's language also suggests more strongly that Congress had in mind an alternative enforcement scheme inconsistent with a private right of action. That language does not impose on airport developers a duty that arguably could run in favor of private plaintiffs. Rather, it imposes only the duty to give "assurances" to "the Secretary." The view that Congress intended to enact an exclusively administrative enforcement scheme is reinforced by legislative history that refers only to the right of air carriers "to consult" with the Secretary. *See* H.R.Rep. No. 594, 94th Cong., 2d Sess., *reprinted in* 1976 U.S. Code Cong. & Admin.News 1600, 1614; H.R.Conf.Rep. No. 1292, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.Code Cong. & Admin.News 1638, 1648. For this reason, we believe that Congress did not intend to create a private right of action under § 2210. *See Arrow Airways, Inc. v. Dade County,* 749 F.2d 1489 (11th Cir.1985); *IFC Aviation,* No. 84–1945–T, slip op. at 2; *Hill Aircraft,* 561 F.Supp. at 671–73 (discussing § 2210's predecessor).

### C.

■ Interface also says that Massport assesses, on flights departing through terminal E, a charge that amounts to nearly $10 per passenger flown. Interface claims that this charge violates the Anti-Head-Tax

Act, 49 U.S.C.App. § 1513. The statute says

> (a) No state (or political subdivision thereof . . .) shall levy or collect a tax, fee, head charge, or other charge, directly or indirectly, on persons traveling in air commerce or on the carriage of persons traveling in air commerce or on the sale of air transportation or on the gross receipts derived therefrom. . . .
>
> (b) . . . nothing in this section shall prohibit a State (or political subdivision thereof . . .) owning or operating an airport from levying or collecting reasonable rental charges, landing fees, and other service charges from aircraft operators for the use of airport facilities.

In this case, we find that the statute impliedly confers on Interface a private right of action.

The primary beneficiaries of this statute are obviously air travelers, not air carriers. Still, by prohibiting the levying of taxes on the *carriage of persons,* the statute at least in some instances gives air carriers a "benefit" that is "especial," at least when compared with the benefit conferred on the general public. The ban on head taxes means that air carriers will neither have to face diminished demand for costlier services nor have to absorb all or part of the charge by reducing ticket prices. *Cf. Indianapolis Airport Authority v. American Airlines, Inc.,* 733 F.2d 1262, 1267 (7th Cir.1984) ("Whether airline or passenger ultimately bears the cost of an airport fee depends on the conditions of supply and demand rather than on who is assessed the charge."). Given the close relation between traveler and carrier, it seems reasonable to give some weight to this "especial benefit."

*Moreover, the second, third, and fourth Cort* factors also support implication of a private right of action. With respect to the "legislative intent" to permit private enforcement actions, the absence of the word "Secretary" from the statute suggests that Congress did not consider it especially important to employ administrative expertise in the statute's enforcement. This suggestion is reinforced by the fact that Congress did not provide the extensive administrative and judicial enforcement scheme for § 1513 that it created for §§ 1349(a) and 2210. Moreover, the legislative history of § 1513 suggests that Congress viewed air carriers as a kind of surrogate for air passengers. Congress realized, for example, that in banning taxes on the carriage of persons, and thereby directly benefiting air carriers, it simultaneously protected air travelers from paying a tax "passed through" to their tickets. *See* S.Rep. No. 12, 93d Cong., 1st Sess., *reprinted in* 1973 U.S. Code Cong. & Admin.News 1434, 1451. Because the amount of tax imposed on each passenger is ordinarily small, individual travelers may prove unwilling to take the time and trouble to determine whether the tax is unlawful. A carrier, on the other hand, will often have a significant financial incentive, and the expertise needed, to enforce the statute. Thus, private enforcement would further the purposes of § 1513. Finally, the area is one especially suited for federal action, in that the statute itself seeks to prohibit certain activity by the States. Because all four *Cort* factors argue to some degree in favor of the existence of a private right of action, we conclude that in this instance the Congress intended to grant a private right of action. *See Indianapolis Airport Authority,* 733 F.2d 1262 (assuming without discussion that a private right of action exists under § 1513); *American Airlines, Inc. v. Philadelphia,* 414 F.Supp. 1226 (E.D.Pa.1976) (same).

### III.

On appeal, Interface also asserted several new claims. It alleged that Massport's actions violate the Supremacy and Commerce Clauses of the United States Constitution. Because these constitutional claims were not raised below, we will not consider them here. *See United States v. State Tax Commission,* 481 F.2d 963, 976 (1st Cir. 1973); *Securities & Exchange Commission v. Milner,* 474 F.2d 162, 166 (1st Cir. 1973). For the same reason, we also will not consider Interface's claims under 42 U.S.C. § 1983 (1982). *See Dobb v. Baker,* 505 F.2d 1041, 1044 (1st Cir.1974).

## IV.

In sum, with the exception of the claim under 49 U.S.C. § 1513, we affirm the district court's dismissal of Interface's claims. The judgment of the district court with respect to § 1513 is vacated, and the case is remanded for proceedings not inconsistent with this opinion.

*So ordered.*