GEMINI CONCERTS, INC., Plaintiff,

v.

TRIPLE–A BASEBALL CLUB ASSOCI-ATES and Don Law Company, Inc., Defendants.

Civ. No. 87–0140 P.

United States District Court, D. Maine.

July 8, 1987.

James Coyne King, Hanify & King, Professional Corp., Boston, Mass., Harold J. Friedman, Portland, Me., for plaintiff.

Michael D. Seitzinger, Augusta, Me., Douglas K. Mansfield, Casner, Edwards & Roseman, Boston, Mass., for Don Law Co.

Keith A. Powers, Portland, Me., for Triple-A.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

Plaintiff Gemini Concerts, Inc. ("Gemini") has alleged that the exclusive agree-

ment signed by Defendants Don Law Company, Inc. ("Law") and Triple-A Baseball Club Associates ("Triple-A") constitutes an unreasonable restraint of trade and a concerted refusal to deal in violation of the Sherman Act, 15 U.S.C. § 1 et seq. (1982 & Supp.1985). Plaintiff commenced this action on May 13, 1987, seeking a temporary restraining order. At the hearing that followed, the parties agreed that the Court should consider the case on its merits and adjudicate the question of liability; damage issues were bifurcated for resolution at a later date, if necessary.

Plaintiff and Defendant Law are in the business of promoting popular music concerts and have competed over the years in Maine; Providence, Rhode Island; Boston, Massachusetts; and elsewhere in New England. Defendant Triple-A is the owner of the Old Orchard Beach Ballpark, home of the Maine Guides, a minor league baseball franchise. In 1983, while the Ballpark was under construction, Triple-A was contacted by approximately a half dozen music promoters, including Law and Gemini, who expressed interest in promoting concerts in the facility. Each promoter was informed that Triple-A had neither the time nor money to make the facility suitable for concerts, and no concerts were performed there during 1984 or 1985.

During this period, Gemini limited its entreaties to Triple-A to one or two phone calls, but Law was more persistent. Numerous discussions over several years culminated in a May 1986 agreement in which Triple-A granted Law the exclusive right to promote concerts at the Ballpark for a two-year term with an option to renew for an additional five years thereafter. In return, Law guaranteed Triple-A a minimum return per concert season or a percentage of the gross receipts, whichever was higher. Law also agreed that he would select "such high quality concerts as will enhance the reputation of the STADIUM, promote the best interest of the community and will not be detrimental to the standing of the STADIUM in the community"; in addition, he agreed to allow Triple-A to prevent the presentation of any act that it reasonably felt did not meet these criteria. Law also

paid for many of the capital improvements that were necessary to make the Ballpark a suitable concert facility. Law and Triple-A shared the cost of upgrading the Ballpark's electrical facilities, and Law paid all the expenses involved in upgrading the roadways, fencing and screening the park for concerts, providing a backstage area for performers, and preparing the stage footing. In addition, Law paid for the rental of the stage itself, an expense that it eventually recouped by charging performers an amortization fee.

Triple-A President Jordan Kobritz testified that he awarded the contract to Law because of Law's good reputation and because he seemed to be the promoter who was most receptive to accommodating Triple-A's needs. Both Kobritz's testimony and the contract language itself indicate that Triple-A was concerned that the presentation of concerts not damage its reputation in the community or in any other way interfere with its baseball schedule. Kobritz testified that by signing the contract with Law for a series of events over a number of years, he obtained a producer who had an interest in promoting his facility rather than in simply promoting a single event, and that he received the funding necessary to make the capital improvements without which concerts would not have been possible at all. Kobritz testified that he was aware that other communities had passed zoning ordinances prohibiting concerts after having had bad experiences with them, and he indicated that he believed that an exclusive arrangement with one reputable promoter would give both parties a shared interest in the long-term success of his facility. Law's president, Don Law, testified that he took a substantial risk in investing a large sum of money in capital improvements for a facility with no prior history as a concert arena, and that he would not have been willing to finance such improvements without an exclusive agreement.

The Court begins its analysis by rejecting Plaintiff's assertion that the agreement in question constitutes a *per se* violation of the Sherman Act, 15 U.S.C. § 1

et seq. Certain business practices have been found to be so inconsistent with the free market principles embodied in the Sherman Act that they are conclusively presumed to be unreasonable and cannot be saved by the offering of any business justification. *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985); *United States v. General Motors Corp.*, 384 U.S. 127, 146, 86 S.Ct. 1321, 1331, 16 L.Ed.2d 415 (1966). Exclusive dealing contracts, however, are not *per se* illegal and must be judged on a case-by-case basis under the rule of reason. *The Interface Group, Inc. v. Massachusetts Port Authority*, 816 F.2d 9 (1st Cir. 1987). *See Murdock v. City of Jacksonville*, 361 F.Supp. 1083, 1088 (M.D.Fla. 1973).

A business relationship is not "unreasonable" under antitrust law unless its anticompetitive consequences outweigh its legitimate business purposes. *Massachusetts Port Authority*, 816 F.2d at 10 (citing 7 P. Areeda, *Antitrust Law* ¶ 1500, at 362–63 (1986) (hereafter P. Areeda). In judging the seriousness of anticompetitive consequences, one looks not to the harm suffered by an individual competitor but, rather, to harm inflicted upon the competitive process itself. *Id.* (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)). A collaboration that increases output and that "makes possible the very activity that is allegedly restrained" is procompetitive and reasonable under the antitrust laws. 7 P. Areeda, ¶ 1503(b), at 375; ¶ 1504, at 379.

The impact of a challenged business arrangement on competition cannot be assessed without determining the parameters of the relevant market. Market composition has two distinct components: the product market and the geographic market. Businessmen are in the same product market if their commodities are "reasonably interchangeable" with each other so that consumers could reasonably select one or the other to fulfill the same need. *See United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007,

100 L.Ed. 1264 (1956). In determining whether two products belong to the same or different markets, a court may properly consider whether their differences render them generally noncompetitive with each other, whether they are directed toward distinct classes of customers, whether their prices are similar or distinct, and whether the public perceives them as interchangeable. *See Brown Shoe Co. v. United States*, 370 U.S. at 325, 82 S.Ct. at 1523. Similarly, the extent of the geographic market can be assessed by determining who the consumers of a product are and over what area similar products will be able to compete with substantial parity. L. Sullivan, *Antitrust* 41 (1977). *See Home Placement Serv., Inc. v. Providence Journal Co.*, 682 F.2d 274, 280 (1st Cir.1982), *cert. denied*, 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983).

Plaintiff has asserted that the relevant market in the present case consists of "concerts performed at the ballpark," an assertion that is without merit. Concerts performed at the Ballpark clearly compete with other concerts. Furthermore, the Court concludes on the record here made that no distinction that is meaningful in competitive terms can be drawn between indoor and outdoor concerts. Witnesses testified that it is common for the same performers to play at both indoor and outdoor venues during their summer tours. Representatives of both promoters testified that their companies promote both indoor and outdoor summer concerts, and Plaintiff offered no testimony indicating that these events are attended by different groups of consumers or that the ticket price charged varies depending on whether a concert is staged indoors or outdoors. In sum, it is clear to the Court that under *Brown Shoe Company* and its progeny, indoor and outdoor summer concerts are in direct competition with each other.

In their contract, Law and Triple-A agree that Law will not promote other concerts within a seventy-five mile radius of the Ballpark, or in Augusta, Maine, which feature the same act within ninety days before or sixty days after that act has performed

at the Ballpark. This agreement suggests that the parties considered such an area to be in the same geographic market as the Ballpark, and the record is devoid of contrary evidence suggesting a smaller geographic market. This area includes many facilities that, according to the record, have advertised summer concerts in recent years; these include the Cumberland County Civic Center, the Augusta Civic Center, Lewiston Raceway, and Portland City Hall Auditorium. It is clear from the evidence admitted at trial that concerts performed at Old Orchard Beach represent only a small fraction of the relevant market.

■ In judging the reasonableness of a challenged practice, it is necessary "to take into account both the extent of the foreclosure and the buyer's and seller's business justifications for the arrangement." *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236–37 (1st Cir.1983). If the record indicates the existence of legitimate business justifications for a challenged practice, then this will support a finding that the practice does not violate the antitrust laws. *Id.* at 237–38. In the present case, the record is replete with legitimate business justifications for Defendants' agreement. Triple-A required an influx of cash from an outside investor before its facility could be used for concerts at all; its agreement with Law provided that cash. In addition, it is clear that Triple-A chose Law from a field of competitors because it became convinced that Law would conduct his business in a manner that enhanced, rather than harmed, Triple-A's standing in the community. In awarding an exclusive contract, Triple-A hoped to establish a relationship in which each party would promote the other's long-term interests.

Law also obtained legitimate benefits from the exclusive agreement. It, too, stood to benefit from a public perception that concerts at the Ballpark were well run and of high quality, and without an exclusive agreement it would have had no control over those concerts that it did not promote. In addition, even as an exclusive promoter, Law can schedule events only on dates that the Ballpark is not being used for baseball; if other acts were also appearing at the Ballpark, it would be that much harder to find appropriate open dates during the summer. Finally, Law had invested a significant sum in capital improvements to the Ballpark, and has a legitimate interest in preventing its competitors from taking a free ride on its investment; *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 229 (D.C.Cir. 1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987). The Court is satisfied that the exclusivity component of the contract appears reasonably related to recoupment and justification of the investment made by Law.

It appears clear to the Court that the net result of the Defendants' contract has been to increase, rather than to impair, competition. The contract did not result in the closing off of a single concert venue that existed prior to its signing. Rather, by providing financial incentives for both parties and by minimizing certain risks that would loom greater without an exclusive arrangement, it brought forth a new concert arena that had not previously existed. Given Triple-A's lack of funds and its concern about hosting concerts at all, the Court is convinced that the contract "[made] possible the very activity that is allegedly restrained. A combination of competitors that makes possible production that would not otherwise occur at all clearly brings a legitimate benefit." 7 P. Areeda, ¶ 1504, at 379.

Accordingly, it is ORDERED that Plaintiff's request for relief be, and it is hereby, DENIED and that judgment enter for Defendants Triple-A and Law.