883 F.2d 157
 NEW ENGLAND LEGAL FOUNDATION, et al., Plaintiffs, Appellants,
v.
MASSACHUSETTS PORT AUTHORITY, Defendant, Appellee.
NATIONAL BUSINESS AIRCRAFT ASSOCIATION, INC., et al.,
Plaintiffs, Appellants,
v.
MASSACHUSETTS PORT AUTHORITY, Defendant, Appellee.
AIRCRAFT OWNERS AND PILOTS ASSOCIATION, Plaintiff, Appellant,
v.
MASSACHUSETTS PORT AUTHORITY, Defendant, Appellee.
MASSACHUSETTS PORT AUTHORITY, Petitioner,
v.
UNITED STATES DEPARTMENT OF TRANSPORTATION, Respondent.
State of Maine, The Air Freight Association, Regional Air
Carrier Parties, The Aircraft Owners and Pilots Association,
General Aviation Manufacturers Association, and National
Business Aircraft Association, Intervenors.
 Nos. 88-1971 to 88-1973 and 88-2227.
 United States Court of Appeals,
First Circuit.
 Heard May 4, 1989.
Decided Aug. 17, 1989.
 
 John S. Fredericksen, Regional Airline Ass'n, Calvin Davison, Lorraine B. Halloway, and Crowell & Moring, on brief, Washington, D.C., for Regional Air Carrier Parties, intervenor.
 Richard B. Michaud, Bernkopf, Goodman & Baseman, Boston, Mass., Stephen A. Alterman, and Meyers & Alterman, on brief, Washington, D.C., for Air Freight Association, intervenor.
 John C. Hunt, on brief, for intervenor, State of Maine, Maine Dept. of Transp.
 Frank W. Gibson, on brief, Cummaquid, Mass., for NEED Logan, amicus curiae.
 Crocker Snow, on brief, for Aero Club of New England, amicus curiae.
 W.N. DeWitt, Carolyn O'Connor, Boston, Mass., on brief, for The New England Council, Inc., amicus curiae.
 Scott P. Lewis, Michael T. Gass, Palmer & Dodge, on brief, for Airport Operators Council Int'l, amicus curiae.
 George Marshall Moriarty, Roscoe Trimmer, Jr., Richard J. Lettieri, Ropes & Gray, Charles E. Dewitt, Jr., Ira M. Wallach, Massachusetts Port Authority, Boston, Mass.
 Diane R. Liff, Asst. Gen. Counsel for Litigation, Robert D. Young, Barry L. Molar, Attys., Dept. of Transp., Washington, D.C.
 David C. Shilton, Peter R. Steenland, Jr., Appellate Section, Dept. of Justice, Land and Natural Resources Div., Washington, D.C.
 Judith Richards Hope, Joseph E. Schmitz, Scott M. Flicker, Paul, Hastings, Janofsky & Walker, and Stanley J. Green, on brief, Washington, D.C., for intervenor, General Aviation Mfrs. Ass'n.
 Raymond J. Rasenberger, Washington, D.C., for intervenor, National Business Aircraft Ass'n.
 John S. Yodice, Donald L. Hardison, Washington, D.C., Kirk Y. Griffin, Boston, Mass., for Aircraft Owners and Pilots Ass'n.
 Wayne S. Henderson, New England Legal Foundation, Boston, Mass., for New England Legal Foundation.
 Before BOWNES and TORRUELLA, Circuit Judges, and RE,* Judge.
 TORRUELLA, Circuit Judge.
 
 
 1
 The single issue presented by these appeals is the validity of a new landing fee scheme enacted for Boston-Logan International Airport ("Logan") by the Massachusetts Port Authority ("Massport") as part of the initial step of a multi-phased Program for Airport Capacity Efficiency ("PACE"). This issue, although easily stated, is not so easily resolved.
 
 
 2
 Legislative confusion has permitted the coetaneous litigation of this controversy in both judicial and administrative forums. As was aptly put by a judge of this court in relation to other circumstance, "this jurisdictional dichotomy has created a confused class of circumforaneous litigants, wandering perplexedly from forum to forum in search of remediation." Maine v. Thomas, 874 F.2d 883, 884-85 (1st Cir.1989). The result has been apparently conflicting decisions in these separate forums.
 
 
 3
 Before we can reach the merits of this controversy we set out all of its entangled background in detail.
 
 I.
 Background facts
 
 4
 Massport is a public instrumentality of the Commonwealth of Massachusetts[1] which owns and operates the public port facilities of the Commonwealth, including those at Logan Airport in Boston and at Hanscom Field in Bedford, Massachusetts. In early 1988, Massport conducted hearings to consider PACE, an overall plan intended to maximize the efficient use of Logan Airport. Phase I of the plan, dealing principally with the landing fee schedule to be applied to aircraft using Logan, was approved by the Massport Board of Members on March 16, 1988 and was due to go into effect on July 1, 1988. It is the central issue of the controversy before us.
 
 Phase I
 
 5
 The principal feature of Phase I is a landing fee structure consisting of two elements: first, a standard landing fee charge of $91.78 per landing, irrespective of aircraft size; and second, an additional charge of $0.5417 per 1000 pounds of landed aircraft weight. This new method of calculating the landing fee is different from the formula used up to the present, which was based solely on aircraft weight. The old method is the standard manner utilized throughout the country for determining landing fees.[2]
 
 
 6
 The effect of the new fee structure, as compared to the pre-PACE method, is to drastically increase the landing costs of smaller aircraft while conversely decreasing that of larger ones. For example, Massport's own estimates show that under the new fee schedule, the landing fee of a Beechcraft 1900 (a small aircraft) will increase from $25.00 to $101.47, a 306% increase, while that of a Boeing 747 will decrease from $823.99 to $450.31, a 45% reduction.
 
 
 7
 An additional feature under the new method is that aircraft operations that meet Massport's criteria for what is an "essential air service hub operation"[3] are exempt from the standard fee portion of the new landing fee, paying instead the pre-PACE minimum charge of $25.00 per landing. During July and August 1988, Massport received exemption applications from 18 and 17 communities respectively, and granted a total of 16 of these requests.
 
 
 8
 The administrative proceedings are commenced
 
 
 9
 On March 16, 1988, the date of approval by Massport of Phase I, the National Business Aircraft Association ("NBAA")[4] filed a complaint[5] with the Federal Aviation Administration ("FAA"), an agency of the Department of Transportation ("DOT"), claiming the invalidity of the landing fee structure because it was not "fair and reasonable" and was discriminatory against "small aircraft." Similar complaints were filed on April 6, 1988 by the Aircraft Owners and Pilots Association ("AOPA")[6] and, on May 3, 1988, by the Regional Airline Association ("RAA").
 
 
 10
 Thereafter, on May 20, 1988, the Secretary of Transportation ("Secretary") concluded that reasonable grounds existed for commencing a formal investigation of these complaints, and issued an "Order of Investigation" referring the matter to a "Presiding Officer" (administrative law judge-"ALJ") with instructions to the effect that:
 
 
 11
 We will expect the Presiding Officer to receive evidence, conduct a hearing, and issue a written report, including a summary of proposed conclusions, pursuant to 14 C.F.R. Sec. 13.127, on the various issues that have been raised by the complaints--specifically, (1) whether the new landing fee structure (and the companion exemption provisions) that Massport has adopted for Logan Airport violate section 511 of the Airport and Airway Improvement Act, and the grant assurances that have been entered into pursuant thereto, on the grounds that they are not "fair and reasonable"; (2) whether the new landing fee structure (and the companion exemption provisions) are "unjustly discriminatory" under that section and the related grant agreements; (3) whether the new landing fee structure violates the Anti-Head Tax Act or section 308 of the Federal Aviation Act; (4) whether the new landing fee structure (and the companion exemption provisions) invade the authority of this Department in violation of section 307 of the Federal Aviation Act; and (5) whether the new landing fee structure (and the companion exemption provisions) are contrary to the prohibitions set forth in section 105 of the Federal Aviation Act.
 
 
 12
 We will also expect the Presiding Officer to address the following factual issues in his report--(1) whether the cost allocation methodology that underlies Massport's new landing fee structure is fair and reasonable (a) on its face, and (b) as applied to Logan Airport; (2) the likely effect of the new fee structure on commuter airlines and general aviation in terms of the costs it would impose on them, their ability to continue to operate at Logan airport and the effect on commuter airline fares and service; and (3) the appropriateness of Hanscom Field, another aviation facility operated by Massport, as an alternative to Logan Airport as a landing field for general aviation and/or commuter airline users.
 
 
 13
 We direct that the Presiding Officer's written report be issued on or before November 15, 1988.
 
 
 14
 The Secretary requested "that Massport defer its implementation of the new fees until [after completion of the] investigation of the issues raised in these complaints."
 
 The district court actions are commenced
 
 15
 Meanwhile, on April 15, 1988, the New England Legal Foundation ("NELF")[7] filed an action against Massport in the United States District Court for the District of Massachusetts on behalf of itself, the Associated Industries of Vermont,[8] various commuter airlines,[9] and two business entities that owned small aircraft using Logan's facilities,[10] seeking declaratory and injunctive relief to prevent the enforcement of the PACE landing fee structure. On April 19, 1988, the NBAA filed a similar suit on behalf of itself and two Massachusetts business associations,[11] and finally on June 5, 1988, the AOPA also filed a separate action. All three actions were consolidated and contain similar allegations.
 
 
 16
 The substance of these complaints is analogous to that of the administrative charges, although they contain additional constitutional and statutory allegations. As in the administrative proceedings, the primary contention is that by shifting the cost burden of the landing fees from the larger aircraft to the smaller, the new method conflicts with various federal statutes that regulate the national airspace[12] and is thus invalid pursuant to the Supremacy Clause of the Constitution.[13] Such a result, it is alleged, is also invalid because it places an undue burden on interstate commerce in violation of the Commerce Clause of the Constitution.[14] Additionally the claim is made that the new structure discriminates illegally against small aircraft in contravention of the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the Constitution[15] and the Civil Rights Act, 42 U.S.C. Sec. 1983.
 
 
 17
 On May 24, 1988, Massport declined the Secretary's request to postpone implementation of its new fee schedule as of July 1, 1988. Thereafter, the district judge established an expedited discovery schedule to allow motions for summary judgment or injunctive relief to be filed, argued, and decided prior to the effective date of the new fee schedule. Such motions were in fact filed by NELF, NBAA and AOPA on June 8 and thereafter were duly opposed by Massport. The district court scheduled oral argument to be heard on June 29, 1988.
 
 
 18
 On June 28, the eve of the scheduled hearing, the United States filed an amicus curiae appearance in the district court on behalf of DOT, and informed the court that the controversy before it concerned "significant issues of public interest involving areas of law within DOT's statutory authority," and that "DOT has commenced a formal investigation into the new landing fee schedule at issue...." The United States took no position on the merits of the substantive issues before the court because, it claimed, most of them were the subject of DOT's on-going investigation. It urged the court, however, that if it could not finally resolve this litigation prior to July 1, that it issue an injunction preserving the status quo pending completion of the case or the completion of the DOT investigation. The amicus argued that this course of action would allow DOT to address these matters administratively thus complying with the doctrines of primary jurisdiction and exhaustion of remedies. It called the court's attention to the fact that Massport would not be significantly or materially harmed by this delay because it had been considering revision of the landing fee structures for some time prior to this without having taken any action, and because the contemplated change was revenue neutral.
 
 
 19
 The district court proceeded to hold the hearing as scheduled on June 29, at the end of which it ruled from the bench on the merits of the various pending motions for summary judgment and injunctive relief. In finding for Massport the district court concluded that as an airport proprietor it was not preempted by federal law from setting reasonable landing fees notwithstanding that these fees took into account what Massport perceived to be the congested state of the airfield. The court considered the question of congestion and delay at Logan as "central to this dispute," and proceeded to analyze in detail the efforts under the FAA's 1988 Airport Capacity Enhancement Plan and PACE to resolve this problem and improve the efficient use of the airport. Despite these efforts, the district court noted, Logan was still "one of the nation's most congested and delay-prone airports, [a condition which], absent some remedy will not improve in the future as Logan is now administered." The court recognized that "Massport says the reason for this congestion is the use of the airfield by small aircraft and a system of assessing landing fees that does not reflect the true cost of allowing these small aircraft to land." The new fee was designed "to recognize the economic cost, that is, the opportunity cost, of providing a landing slot." The latter, the court reasoned, is not reflected as a function of landing weight, which was the sole consideration of the old landing fee calculations.
 
 
 20
 The district court framed its analysis of the problem by posing three questions:[16] the first was whether the fees were "reasonable." This, it found, was a continuing test prevalent throughout all the applicable legislation including the Commerce Clause, the Anti-Head Tax Act (49 U.S.C.App. Sec. 1513), the Airport and Airway Improvement Act of 1982 (49 U.S.C.App. Sec. 2210), and the Equal Protection Clause. The court concluded, relying on Evansville-Vanderburgh Airport Authority District v. Delta Airlines, Inc., 405 U.S. 707, 713, 717, 92 S.Ct. 1349, 1353, 1355, 31 L.Ed.2d 620 (1972), that the fee was reasonable because it had been "fixed according to [a] uniform, fair and practical standard ... [and was] non-excessive in comparison with the governmental benefit conferred." The court also relied on American Airlines, Inc. v. Massachusetts Port Authority, 560 F.2d 1036, 1039 (1st Cir.1977), for the proposition that if "the facilities [are] relevant to the operation of the airport[, a]nd the revenue from the landing fee is fairly consonant with the cost incurred," the fee structure would be considered reasonable. It found Phase I to be in compliance with the American Airlines standards.
 
 
 21
 The second inquiry to be made, the court said, was to determine whether the fees were discriminatory, and the court concluded that they were not. "The goal ... was to promote a fair and reasonable landing fee which would recover from each user the cost incurred by the proprietor in providing the fees and facilities"; a goal which the court found was achieved by the new fee structure. That in promoting this goal, the plan led some users not to use this facility was not what prompted Massport to enact the new fee structure. This result was an irrelevant side product which did not affect the validity of the fee structure, the court ruled. "[I]t is the proprietor's responsibility to adopt the [landing fee] methodology and apply it, so long as that is done in a fair non-discriminatory fashion," the court said. It then went on to conclude that "[t]here is no unjust discrimination, because the objectives of the airport to reduce congestion and delay are rationally related to legitimate governmental interest ..., it enhances economic and operating efficiency."
 
 
 22
 The third question the court considered was whether there was preemption. Relying on Wardair Canada, Inc. v. Florida Department of Revenue, 477 U.S. 1, 106 S.Ct. 2369, 91 L.Ed.2d 1 (1986); Western Airlines, Inc. v. Port Authority of New York and New Jersey, 817 F.2d 222 (2d Cir.1987); and Midway Airlines, Inc. v. County of Westchester, 584 F.Supp. 436 (S.D.N.Y.1984) the district court concluded there was no preemption "because it seems clearest of all ... that Congress intended the proprietor to set [landing fees]" as a proper exercise of authority granted under Section 1305(a) of the Airline Deregulation Act of 1978.
 
 
 23
 As to the remaining allegations in the various complaints, the district court concluded that no claim had been established under 42 U.S.C. Sec. 1983, and that pursuant to Interface Group, Inc. v. Massachusetts Port Authority, 816 F.2d 9 (1st Cir.1987), no private cause of action existed under 49 U.S.C.App. Sec. 2210. The district court ended its bench ruling by candidly stating that although it had considered the alternative proposed by the "late amicus, [to] pass the buck on to the Department of Transportation," it had decided against this solution, implying that there was a need for a rapid resolution of this controversy. The court thus granted summary judgment to Massport and denied a preliminary injunction against enforcement of the new fee structure. The new fee structure went into effect as scheduled on July 1, 1988.
 
 
 24
 In the meantime the wheels of the federal administrative juggernaught, set in motion by the Secretary's May 20 Order of Investigation, plowed on inexorably.
 
 
 25
 The administrative proceedings are concluded
 
 
 26
 After receipt of extensive evidence, the ALJ issued a comprehensive recommended decision on November 10, 1988, finding that Massport's new landing fee structure (and the companion exemption provisions):
 
 
 27
 (1) violated section 511 of the Airport and Airway Improvement Act of 1982 (49 U.S.C.App. Sec. 2210), and the grant assurances entered into pursuant thereto, on the grounds that they are not "fair and reasonable";
 
 
 28
 (2) also violate section 511 and the grant agreements on the grounds that they are unjustly discriminatory;
 
 
 29
 (3) violate the Anti-Head Tax Act (49 U.S.C.App. Sec. 1513) on the grounds that they are not "reasonable";
 
 
 30
 (4) invade the authority of the DOT in violation of section 307 of the Federal Aviation Act of 1958 (49 U.S.C.App. Sec. 1348);
 
 
 31
 (5) are contrary to the prohibitions set forth in section 105 of the Federal Aviation Act of 1958 (49 U.S.C.App. Sec. 1305); and
 
 
 32
 (6) are preempted by federal law and violate the Commerce Clause, and are thus unlawful.
 
 
 33
 The ALJ rejected the contentions as to violation of section 308 of the Federal Aviation Act of 1958 (49 U.S.C.App. Sec. 1349).
 
 
 34
 Although the ALJ's recommended decision is not directly before us, a proper understanding of the Opinion and Order of DOT, from which Massport petitions for review, and which substantially affirms the ALJ, requires a full discussion of the recommended decision. The ALJ's recommended decision reflects the complexity and singularity of the subject at hand, and clearly imprints that it is not one receptive to amateur participation.
 
 
 35
 After a detailed discussion of the background facts and the various expert studies presented by the parties, analyzing in depth the Massport formula and its allocation of costs, as well as Massport's rebuttal, the ALJ proceeded to answer the specific questions referred to him for investigation by the Secretary.
 
 
 36
 As to whether Hanscom Field could appropriately be used as an alternative to Logan for general aviation[17] and/or commuter airline operations, the ALJ concluded that it could not. The primary reason given for this finding was "because it lacks the connecting opportunities that are otherwise available at Logan." The ALJ pointed out that connecting traffic at Logan accounted for about half of all commuter traffic to that airport. He stated, nevertheless, that Hanscom was of "great utility ... for most general aviation purposes and for limited commuter air carrier purposes."
 
 
 37
 The ALJ's next area of inquiry was determining whether Massport's cost allocation for its new fee structure was fair and reasonable on its face, and as applied at Logan. In analyzing this question, the ALJ observed that there is a "common rubric across the spectrum of [the] statutes" at issue: that of "reasonableness" or the absence of "unjust discrimination." He began by concluding that Massport's new fee structure for landings at Logan assigns 63% of the operational costs to items related to landing operations, with the balance of 37% being attributed to cost categories related to aircraft weight. Although the ALJ considered this a departure from the "true honored and almost universal" weight-based method, he found that no one seriously challenged Massport's legal right to depart from that method. According to the ALJ, the challenge to Massport's new formula, which he called a "hybrid formula," is based on its application and end result, and on Massport's motives in changing from the old system. The AOPA's study, the so-called Kennedy/Jenks/Chilton Report (K/C/J Report), allocated 83.6% of the landing cost to the effects of the aircraft's landing weight, with only 16.4% being attributed to landing operations, while the RAA's study (Korth Study) concluded 89.7% of the landing cost a function of aircraft weight, with the balance 10.3% being related to landing operations.
 
 
 38
 The ALJ then proceeded to analyze the various items of cost allocation as to which there was disagreement: amortization and interest of runway construction and cost of taxiways and airfield land acquisition. He found that although Massport had originally, in the proposed new schedule, allocated these items to weight-related costs, there was a subsequent shift of them to the operations side of costs in the final fee schedule. However, the ALJ was of the opinion that these changes did not affect the bottom line of the fee schedule in the revised version, because other counterbalancing changes of items originally classified as operations related were shifted to the weight related side of the fee schedule. These latter changes were not challenged by anyone.
 
 
 39
 The ALJ concluded that factors other than aircraft weight do in fact contribute to airfield costs, yet found that Massport's allocation method was not scientifically derived. This situation, he concluded, opened the door to considering Massport's motivation for restructuring its fees. After an analysis of various documents in evidence attributed to Massport, as well as other related evidence, the ALJ found that "it is difficult to walk away from the record of this case without inferring that the Massport PACE Plan was conceived, orchestrated and implemented with the principal objective of ridding Logan of small aircraft or severely curtailing their operations. It was a plan that went in search of an economic theory to justify its existence." He therefore concluded that "Massport's new fees [are] unfair, unreasonable and unjustly discriminating."
 
 
 40
 The ALJ then proceeded to the final area of inquiry, determining the likely effect of the fee structure on commuter airlines, including their fares and services, and on general aviation. On this point the ALJ found that the regional air carriers would have an annual increase in landing fee costs of between $4-5 million dollars as against aggregate profits of $3.1 million, thus reflecting an approximate total yearly loss of about $1-2 million. These losses, the ALJ considered, would probably be passed on to the public at an average fare increase per passenger of $3.02, which the ALJ believed, "is not likely to have a significant dampening effect on passenger travel." He found, furthermore, that although there is some evidence that some regional air carriers have discontinued some services or curtailed them minimally as result of the new landing fees, it does not appear that the new fees will significantly reduce regional air carrier services at Logan.
 
 
 41
 The ALJ also was of the opinion that, although general aviation operations at Logan have decreased substantially since this new fee structure went into effect, and more decreases were expected, that "because Hanscom Field was a more viable alternative for general aviation than for regional air carrier service, the effect on general aviation standing alone would not be fatal to the fee structure's legality under federal law."
 
 
 42
 Based on the above findings the ALJ concluded that the PACE plan was unconstitutional because it was preempted by federal law through the Supremacy Clause and because it was contrary to the Commerce Clause. He stated that "these conclusions flow from the findings that the PACE Plan unduly interferes with federal control of airspace management and with national air transportation system access, and that it frustrates the accomplishment of Congressional objectives." In his analysis of the preemption issue the ALJ found that the new fee schedule's "purpose and effect ... is the movement of general aviation aircraft away from Logan Airport," a result which the ALJ ruled was interference "with the Congressionally-mandated system of air traffic management delegated to the FAA." Furthermore, he stated, the exemptions under the PACE program also interfered with the FAA-administered Essential Air Service Program (EAS), a program established as part of the Airline Deregulation Act of 1978 to provide small communities across the country with access to the national air transport system. For the same reasons that the PACE program was invalid because of preemption, the ALJ ruled that it constituted a burden on and interference with interstate commerce, and was thus also void. The ALJ then ruled that the new Massport rate scheme violated section 105 of the Federal Aviation Act (49 U.S.C.App. Sec. 1305). The conclusion flowed from his finding that the landing fees were unreasonable or discriminatory and were therefore impermissible within the Section 105(b) "proprietary powers and rights" exception to Section 105(a), which prohibits enforcement of any law or regulation "relating to rates, routes or services of any air carrier."
 
 
 43
 Massport appealed the ALJ's Recommended Decision to the Secretary of DOT. On December 22, 1988, the Secretary issued an Opinion and Order substantially adopting the ALJ's recommendations, and "affirm[ing] his finding that Massport's current fee structure at Logan Airport is unreasonable and contrary to federal statute." The Secretary concluded, however, that the ALJ had "overstated the extent of the preemptive role of the federal government in the control of airport access and access to the national air transportation system." In clarifying this latter point, the Secretary ruled that pursuant to Section 511 of the Airport and Airways Improvement Act of 1982, Section 105(b) of the Federal Aviation Act, and the Anti-Head Tax Act (49 U.S.C.App. Sec. 1513(b)), "it is ... within an airport proprietor's authority to impose reasonable [, nondiscriminatory,] landing fees or other user fees, even if such fees may result in a decline in usage by a class of user or other indirect effects on users." In this respect, "[w]hile an airport sponsor has wide latitude in recovering costs and using fees to improve the efficient use of airport facilities, the FAA is vested with the authority to control, regulate and manage air traffic." These distinctly separate federal and state interests, the Secretary found "difficult to balance ... to ensure that an airport works effectively as part of a larger national system of air transportation."
 
 
 44
 The Secretary agreed with the ALJ's conclusion that the new fees were unreasonable because the methodology for cost allocation "was not scientifically derived." It found that the "underlying problem ... [was] that it employs a traditional cost allocation approach but biases the results by the inappropriate use of opportunity costs considerations ... [which] has resulted in Massport allocating certain costs exclusively to one of two measures--aircraft weight or number of [landing] operations--but in some instances making those allocations for reasons that are not defensible on traditional cost allocation grounds." The Secretary considered Massport's determination that its crash/fire/rescue capital costs, its airfield maintenance and operation costs, and its administrative costs would be charged solely to the landing operation component of the fee structure. Because the FAA establishes certain requirements for airfield crash, fire and rescue equipment based upon the size and capacity of the aircraft using the field, it was illogical, the Secretary reasoned, to allocate these costs solely on the number of landing operations without attributing a "reasonable portion of these costs ... by weight as a proxy for aircraft size and capacity." The Secretary found it equally unreasonable to apportion, solely on the number of landing operations, the airfield maintenance and operation costs because, as Massport itself admitted, " 'many of these costs are more attributable to the type and setting of the airfield.' " Administrative costs, which Massport also allocated to operations, the Secretary found, "lack[ed] little direct relationship to any particular costing attributes," and therefore should not have been attributed solely to number of operations but rather "should have been divided between landing weight and operations in the same proportion as the other costs, or in some other logical basis." Lastly, the Secretary faulted Massport's failure to separate opportunity[18] cost considerations from its cost allocation methodology, being of the view that if opportunity costs are to be considered at all, they "should be treated like other costs and should not intrude upon allocating methodology."
 
 
 45
 By "unfairly and unreasonably" penalizing the smaller aircraft "by allocating to them a disproportionate amount of airport costs," the Secretary concluded that Massport "goes beyond a fair and reasonable action to effect the legitimate recovery of costs, and clearly crosses into an area which is inconsistent with [its] federal grant assurances." The Secretary concluded this action to be violative of Section 511 of the Airport and Airway Improvement Act of 1982 and the federal grant assurances. This finding, the Secretary ruled, made it unnecessary to enter the issue of Massport's motivation in adopting its fee schedule.
 
 
 46
 The Secretary then considered the second major area of Phase I of PACE, the exemption program. In agreement with the ALJ, he ruled that the part of the new fee schedule was preempted by the federal EAS program because "Massport has retained the discretion to determine what points are eligible and has excluded points that the federal government has made eligible under the EAS program." The Secretary also concluded that the Massport program was faulted because it set standards for frequency of service, aircraft size, and number of carriers serving the community, subjects which the Secretary considered were within the scope of areas of decision reserved to the DOT. The Secretary, however, disagreed with the ALJ to the extent that he had found that any local program was impermissible, indicating instead that "[a] properly structured exemption program that follows much more closely the federal EAS program" could overcome the preemption hurdle. The Secretary thus concluded that the Massport exemption program contravened Section 105 of the Federal Aviation Act.
 
 
 47
 The Secretary went on to hold that because the fees were unreasonable, they were preempted by both Sections 105 and 307 of the Federal Aviation Act, as the ALJ had recommended. However, the Secretary disagreed and refused to adopt the ALJ's conclusion that the Anti-Head Tax Act was contravened, ruling instead that the new fee schedule was not in form or substance a head tax or its equivalent. The Secretary also refused to adopt the ALJ's recommendations with regard to alleged constitutional violations because, in view of its other rulings, it found it unnecessary to reach those issues.
 
 
 48
 Finally, the Secretary concluded that "if the fee structure and exemption program referred in this order remain in effect for more than seven days after the issuance of this order," Massport will cease to be eligible for Fiscal Year 1989 Airport Improvement Program funds pursuant to DOT's Transportation Fiscal Year 1989 Appropriation Act. P.L. 100-457, 102 Stat. 2130.
 
 
 49
 Following the Secretary's decision, Massport suspended the new fee regulation effective December 27, 1988, and reinstated the prior weight-based structure pending this judicial review.
 
 II.
 
 50
 Through the tortuous road we have described we reach the present state of affairs: on substantially the same record and issues, plaintiffs in the district court case appeal from the grant of summary judgment in favor of Massport declaring valid PACE's Phase I and the denial of injunctive relief to prevent its enforcement, while conversely, in the administrative proceedings before DOT, Massport petitions us for review of the Secretary's finding that Phase I is contrary to preeminent federal law, and mandates withdrawal of federal subsidy unless Massport falls in step with the federal requirements. We are left to our own devices, with little help from the perpetrators of this legal marathon. We must decide what to do with these two seemingly conflicting decisions by two judicial actors with apparent jurisdiction over the subject matter which they decided.
 
 
 51
 A narrowing of the controversy?
 
 
 52
 In No. 88-2227, Massport challenges the Secretary's ruling that the landing fee structure adopted for Logan is not reasonable, and therefore is unjustly discriminatory and a violation of section 511 of the Airport and Airway Improvement Act of 1982 (49 U.S.C.App. Sec. 2210) and the grant assurance entered into thereunder. Massport also appeals from the Secretary's conclusions that the Massport landing fee structure is preempted under sections 105 and 307 of the Federal Aviation Act (49 U.S.C.App. Secs. 1305 and 1348) and that its exemption program follows a similar fate under section 105 of that statute.
 
 
 53
 In Nos. 88-1971, 1972 and 1973, the allegation of errors is more variegated, although in the end the basic controversy remains the same. As would be expected, NELF and its companion plaintiffs in No. 88-1971 claim that the district court erred in ruling that there is no private cause of action pursuant to section 511 of the Airport and Airway Improvement Act of 1982 (49 U.S.C.App. Sec. 2210). They also find fault with the district court's failure to rule that Massport's new landing fee scheme violated the specific preemption provision of Section 105 of the Federal Aviation Act (49 U.S.C.App. Sec. 1305(a)), and, generally, is preempted "by the comprehensive federal program embodied" in that statute, thus contravening the Supremacy Clause of the Constitution (art. VI, cl. 2). Additionally, these appellants continue to insist that Massport's new landing fee violates the Federal Anti-Head Tax Act, 49 U.S.C.App. Sec. 1513(b), and that the district court erred in not so ruling. Lastly it is claimed that the district court should have found that the new landing fees unduly burden interstate commerce in violation of the Commerce Clause (art. I, Sec. 8, cl. 3) and violate the Equal Protection and Due Process Clause of the Fourteenth Amendment, giving rise to a cause of action under the Civil Rights Act, 42 U.S.C. Sec. 1983.
 
 
 54
 The errors alleged by NBAO (and co-plaintiffs) in No. 88-1972, and by AOPA in No. 88-1973, track those claimed by appellants in No. 88-1971 and need not be repeated.
 
 The standard(s) of review
 
 55
 A starting point to the unraveling of any appellate controversy, one particularly relevant to the appeals presently before us, is determining the standard(s) which we must apply in reviewing the ruling(s) appealed from. We commence with the district court's grant of summary judgment to Massport.
 
 
 56
 Before the district court, all parties agreed that there was no genuine issue as to any material fact, a conclusion with which the district court concurred. The issue on appeal, therefore, is simply whether the district court committed error of law. New England Apple Council v. Donovan, 725 F.2d 139, 141 n. 2 (1st Cir.1984). The standard of review for questions of law decided by a district court is, of course, de novo scrutiny, as the conclusions of law of a trial court are not binding on the reviewing court. United States v. Yoffe, 775 F.2d 447, 451 (1st Cir.1985).
 
 
 57
 In determining the standard of review to be applied to the appeal from the Secretary's decision, our task is also somewhat simplified in that we are not concerned with the review of factual findings.[19] As stated (perhaps overstated) by Massport in its brief, "[t]he most remarkable aspect of the present Administrative Appeal lies in the fact that nothing in the ALJ's Recommended Decision nor in the Department's Opinion contradicts the undisputed facts upon which the District Court relied in reaching its own, opposite conclusion." Brief of Petitioner-Appellant Massachusetts Port Authority in No. 88-2227, p. 15. Deciding the standard of review to be applied by us to the legal conclusions of the Secretary is, however, the subject of dispute among the parties and not easily resolved.
 
 
 58
 The Secretary urges upon us the "arbitrary, capricious, ... abuse of discretion, or otherwise not in accordance with law" standard of Section 6 of the Administrative Procedures Act, 5 U.S.C. Sec. 706(2)(A), and argues that "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entitled to administer." Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). As a matter of law, the Secretary contends, we are required to defer to the agency's interpretation of its statute even if the interpretation was not "the reading the court would have reached if the question initially had arisen in a judicial proceeding." Id. at 843 n. 11, 104 S.Ct. at 2782 n. 11; McInnis v. Weinberger, 530 F.2d 55, 63 (1st Cir.1976).
 
 
 59
 Massport challenges the applicability of this standard of review to this appeal. Massport claims that the Section 6 standard is irrelevant to the present case because the subject matter of this suit, landing fees, has been left by Congress to local regulation. Thus, it argues, DOT's conclusions, with respect to allocation methodology and the reasonableness of landing fees, are not within the scope of DOT's particular expertise. See Dion v. Secretary of Health and Human Services, 823 F.2d 669, 673 (1st Cir.1987) (courts need give deference to interpretations of law of an agency only when these conclusions are "within the agency's expertise"); McCuin v. Secretary of Health and Human Services, 817 F.2d 161, 168 (1st Cir.1987).
 
 
 60
 Because there are several statutes here in question, we believe for purposes of analysis it is best to deal with each statute individually.
 
 
 61
 Section 511 of the Airport and Airway Improvement Act of 1982
 
 
 62
 We commence our review of these issues in the light of Section 511 of the Airport and Airway Improvement Act of 1982, 49 U.S.C.App. Sec. 2210,[20] because in a sense this is the least controversial of the statutes before us. The district court dismissed the allegations in the various complaints making claims pursuant to Sec. 511, ruling that no private cause of action existed under this provision. Obviously, Massport, who initially raised this issue, supports this holding, and the Secretary, although not a party to the district court law suit, is equally in agreement. Although appellants in Nos. 88-1971, 1972 and 1973 challenge this result, we must affirm it, as it is in keeping with unambiguous circuit precedent, Interface Group, Inc. v. Massachusetts Port Authority, 816 F.2d 9, 15 (1st Cir.1987), as well as the clear language of the statute. Ante n. 18. See also Arrow Airways, Inc. v. Dade County, 749 F.2d 1489, 1491 (11th Cir.1985). Cf. Rocky Mountain Airways, Inc. v. Pitkin County, 674 F.Supp. 312 (D.Colo.1987) (airline has no private cause of action against county under 42 U.S.C. Sec. 1983 for county's alleged violation of Sec. 511).
 
 
 63
 At least as to Sec. 511, this outcome has the benign effect of eliminating potentially conflicting decisions between the judicial and administrative forums. As to Sec. 511 there can be no conflict, as the district court did not decide the merits of the questions raised. But affirmance of the district court's decision on this issue does not end the matter. It just shifts the arena in which this controversy is to be fought from the courts to the administrative forum. Interface Group, Inc., 816 F.2d at 15 ("Congress intended to enact an exclusively administrative enforcement scheme"). It is left to the Secretary to enforce Sec. 511. Arrow Airways, Inc., 749 F.2d at 1491.
 
 Section 511(b) provides in part that:
 
 64
 To insure compliance with this section, the Secretary shall prescribe such project sponsoring requirements, consistent with the terms of this title, as the Secretary considers necessary.
 
 
 65
 49 U.S.C.App. Sec. 2210(b). This Congressional anointment of the power "to insure compliance" upon the Secretary, in our view, does more than merely exclude private parties from the right to file an action in court. In terms of the issue before us it has the more significant effect of indicating the standard by which we should review the Secretary's enforcement actions.
 
 
 66
 First of all, there should be little doubt that Congress has entrusted the administration of Sec. 511 to the Secretary. If this be the case, as it is, even without more we are required by Chevron to give "considerable weight" to the Secretary's construction of Sec. 511, and to the actions taken by him "to insure compliance" therewith. The limiting language in Sec. 511 (e.g., that the Secretary's actions insuring compliance be "consistent with the terms of this title") is a constraint upon the Secretary's power, establishing the outer limits of authority as being within the framework of Sec. 511. But subject to this limit, the Secretary has wide discretion.
 
 
 67
 There is more, however. The specific language of Sec. 511(b) not only establishes that it is the Secretary that prescribes the requirements of sponsorship, but also that the requirements are those "as the Secretary considers necessary " (emphasis supplied). Additionally, the introductory paragraph to Sec. 511(a) establishes that assurances shall be submitted which are "satisfactory to the Secretary " (emphasis supplied). In other words, in insuring compliance with Sec. 511, it is up to the Secretary to decide what is necessary and satisfactory. This language establishes abuse of discretion review, the most deferential standard of review available for administrative appeals, with the exception of those rare instances in which there is of no judicial review at all. Davis, A Basic Guide to Standards of Judicial Review, 33 S.D.L.Rev. 469, 480 (1988).
 
 
 68
 With this standard in mind we view the Secretary's actions as they are constrained by other parts of Sec. 511. The Secretary is required by this statute to see that the project for which federal grant funds are expended "will be available for public use on fair and reasonable terms and without unjust discrimination." 49 U.S.C.App. Sec. 2210(a)(1). Although the statute does not define this terminology, Sec. 511(a)(1)(A) refers to "substantially comparable rates, fees ... and other charges with respect to facilities directly and substantially related to providing air transportation." This provision also speaks of "substantially comparable rules, regulations and conditions as are applicable to all such airports and which utilize similar facilities." Id. This appears to us to establish as "reasonable" any fee or charge by the airport proprietor which fairly and rationally reflects the cost to users that are comparably situated. To make such an equation it is essential that a methodology be established which is founded upon a principled, non-arbitrary basis.
 
 
 69
 The Secretary concluded that the Massport fee structure was unreasonable under Sec. 511 because the methodology for cost allocation "was not scientifically derived." We agree with the Secretary's rationale, previously discussed, and believe that the record fully supports this conclusion. See ante at 165-66 for full discussion. This is definitely an area of expertise primarily reserved to the Secretary's discretion, and not to be second-guessed by appellate courts, even assuming we would have reached a different result if the matter had been initially raised before us. Chevron, U.S.A., supra; McInnis, supra.
 
 
 70
 In conclusion, we affirm the district court's action dismissing the Sec. 511 private causes of action, as well as the Secretary's ruling to the effect that Massport's fee structure was unreasonable and discriminatory and a violation of the grant conditions resulting in the forfeiting of Massport's eligibility to receive additional funds in Fiscal Year 1989.
 
 
 71
 The Federal Anti-Head Tax Act (49 U.S.C.App. Sec. 1513(b))
 
 
 72
 Stated in simplified form the Federal Anti-Head Tax Act[21] prohibits states and their political subdivisions from directly or indirectly charging interstate passengers what we shall short-handedly call a head tax.[22] This statute specifically exempts from this prohibition the "levying or collecting [of] reasonable ... landing fees ... from aircraft operators for the use of airport facilities." 49 U.S.C.App. Sec. 1513(b).
 
 
 73
 We have a somewhat inverse situation to that under Sec. 511 of the Airport and Airway Improvement Act of 1982: here, the Secretary decided that there was no cause for complaint under the Anti-Head Tax Act "[s]ince the PACE fee formula does not appear to be in form or substance a head tax or its equivalent." This finding is not appealed by any party to the administrative proceeding.[23]
 
 
 74
 The district court allowed the private action under Sec. 1513, Interface Group, Inc., 816 F.2d at 16, and on the merits ruled that the landing fees were reasonable under Sec. 1513(b), thus impliedly agreeing with the Secretary's ruling that there is no head tax issue raised. In any event, the result is the same in both cases, that there is no violation of Sec. 1513 brought about by the new landing fee scheme. We affirm the district court's ruling, but we do so on the basis that Massport's actions in enacting Phase I are outside the scope of Sec. 1513, as not being a head tax or its equivalent. The landing fee is clearly not a "charge ... on persons traveling in air commerce," nor is it a levy "on the carriage of persons" so traveling, "on the sale of air transportation," or "on the gross receipts derived therefrom." 49 U.S.C.App. Sec. 1513(a). Although the new landing fee may have the effect, as pointed out by the ALJ, of increasing the average fare per passenger, this is an increase in the operational cost unrelated to the Anti-Head Tax Act prohibitions, and is no more proscribed than would be increasing the charge per landed pound under the old system, an increase which also would eventually affect the cost of the air fare to the passengers.
 
 
 75
 The ultimate rulings of both the district court and the Secretary under 49 U.S.C.App. Sec. 1513 are thus affirmed.Section 105 of the Federal Aviation Act of 1958, as amended
 
 
 76
 Section 105 of the Federal Aviation Act of 1958[24] fuels much of the controversy before us. We are provided with no easy way out of the apparent head-on conflict between the district court's decision[25] and that of the Secretary. The district court decided that Sec. 105(a) was not breached by Massport's new landing fees because it found them to be "reasonable," and thus to constitute the exercise of permitted proprietary powers under Sec. 105(b). In contrast, the Secretary concluded that the fees were "unreasonable" because they were based on improper cost allocation, constituted an attempt to control "rates, routes or services," and were thus preempted by Sec. 105(a).
 
 
 77
 Given the embroiled issues which it faced, we cannot fault the district court for metaphorically "taking the bull by the horns" and deciding the controversy (with considerably more celerity than was displayed by the DOT, we might add). Nevertheless, with the benefit of hindsight, and perhaps more time to balance the interests at stake and decipher Congress' somewhat inscrutable wishes, we conclude that the district court committed error, not only in its decision, but also in not deferring to the Secretary's primary jurisdiction over this controversy as was requested by the DOT in its last minute amicus intercession.
 
 
 78
 The issue is not one of power to decide the controversy, the question is whether the court should have exercised it in view of the pending administrative proceedings. Whenever both the courts and an administrative agency appear to have jurisdiction over a particular controversy, the question arises as to which forum should speak first on the matter. The doctrine of "primary jurisdiction," also referred to as the "deference doctrine," see Mashpee Tribe v. New Seabury Corp., 592 F.2d 575, 580 n. 1 (1st Cir.), cert. denied, 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979), "primarily serves as a means of coordinating administrative and judicial machinery." Id. at 580. This is "necessary if consistent and coherent policy [is] to emerge." Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 68, 91 S.Ct. 203, 208, 27 L.Ed.2d 203 (1970).
 
 
 79
 The doctrine of primary jurisdiction has become one of the key judicial switches through which this current has passed. When there is a basis for judicial action, independent of agency proceedings, courts may route the threshold decisions as to certain issues to the agency charged with primary responsibility for governmental supervision or control of the particular industry or activity involved.
 
 
 80
 Id. See also United States v. Western Pacific R. Co., 352 U.S. 59, 63-65, 77 S.Ct. 161, 164-65, 1 L.Ed.2d 126 (1956); Far Eastern Conf. v. United States, 342 U.S. 570, 573-75, 72 S.Ct. 492, 493-95, 96 L.Ed. 576 (1952).
 
 
 81
 Port of Boston involved an interpretation of the tariff filed by marine terminal operators with the Federal Maritime Commission ("FMC"). The terminal operators raised the charges without prior approval of the FMC and sued in district court to recover for the amounts owed. The vessel owners and their agents defended on the grounds that the increased charges had not been approved by the FMC. The district court stayed the proceedings to allow the FMC to pass upon the validity of the increases, a decision which was reversed by the court of appeals.
 
 
 82
 The Supreme Court disagreed with the court of appeals, holding that this was "an almost classic case for engaging the doctrine [of primary jurisdiction]." Port of Boston, 400 U.S. at 68, 91 S.Ct. at 208. The factors considered were: that the FMC was primarily responsible for supervising these agreements, that the FMC "was uniquely qualified to consider the dispute in light of the overall policies concern[ed]," id. at 69, 91 S.Ct. at 208, and that neither the FMC nor the government were parties to the private litigation. Id. at 68-69, 91 S.Ct. at 208-09.
 
 
 83
 In Mashpee Tribe v. New Seabury Corp., supra, we synthesized Supreme Court doctrine by identifying the three principal factors which a court should consider in determining whether to defer: "(1) whether the agency determination lay at the heart of the task assigned the agency by Congress; (2) whether agency expertise was required to unravel intricate, technical facts; and (3) whether, though perhaps not determinative, the agency determination would materially aid the court." Mashpee Tribe, at 580-81. See Chicago Mercantile Exchange v. Deaktor, 414 U.S. 113, 114-15, 94 S.Ct. 466, 466-67, 38 L.Ed.2d 344 (1973); Ricci v. Chicago Mercantile Exchange, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973). We apply these guides to the present appeals.
 
 
 84
 (1) Centrality of agency determination
 
 
 85
 In our view, although the actual setting of landing fees has been left by Congress to local action, there is no question that this area is generally encompassed within the scope of supervision by an "agency [, e.g., DOT,] charged with primary responsibility for governmental supervision or control of the [aviation] industry." Port of Boston, 400 U.S. at 68, 91 S.Ct. at 208. The DOT's supervision and management of the nation's navigable airspace is "intensive and preclusive." Burbank v. Lockheed Air Terminal, 411 U.S. 624, 633, 93 S.Ct. 1854, 1859, 36 L.Ed.2d 547 (1973).
 
 
 86
 The DOT, through the FAA, has broad authority and responsibility to regulate navigable airspace to assure its efficient use (including minimizing congestion) by private commerce, and to protect "the right of freedom of transit through navigable airspace" granted by Congress to all persons. 49 U.S.C.App. Sec. 1304. Indeed, "it would be difficult to visualize a more comprehensive scheme of combined regulation, subsidization, and operational participation than that which Congress has provided in the field of aviation." American Airlines, Inc. v. Hempstead, 272 F.Supp. 226, 232 (E.D.N.Y.1967), aff'd, 398 F.2d 369 (2d Cir.1968), cert. denied, 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561 (1969). As Justice Jackson said in concurrence in Northwest Airlines, Inc. v. Minnesota, 322 U.S. 292, 303, 64 S.Ct. 950, 956, 88 L.Ed. 1283 (1944), in language closer to home:
 
 
 87
 [Airplanes] move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands. The moment a ship taxis onto a runway it is caught up in an elaborate and detailed system of controls.
 
 
 88
 Title IV of the Aviation Act, 49 U.S.C.App. Secs. 1371-89, established a comprehensive plan of federal economic regulation of air transportation which was administered by the Civil Aeronautics Board ("CAB"). In 1978, Congress enacted the Air Deregulation Act, P.L. 95-504, 92 Stat. 1705 (1978), putting into effect a new economic policy whereby free market competition would largely supplant government control of domestic air transportation. Those regulatory responsibilities of the CAB that remained post-airline deregulation were assigned to DOT. 49 U.S.C.App. Sec. 1551(b)(1)-(3).
 
 
 89
 In reducing federal economic regulation of the field to allow the forces of free competition to rule the marketplace, Congress obviously did not intend to leave a vacuum to be filled by the Balkanizing forces of state and local regulation. Congress expressly preempted state and local regulation by enacting Sec. 105(a), which specifically provides that "no state or political subdivision thereof ... shall enact or enforce any law, rule, regulation, standard, or other provision ... relating to rates, routes, or services of any air carrier...." 49 U.S.C.App. Sec. 1305(a). Although Sec. 105(b) allows local authorities to operate airports as proprietors, this grant is not unlimited and is subject to curbing if it transgresses into the general field reserved for federal interest. 49 U.S.C.App. Sec. 1305(b).
 
 
 90
 In any event, for purposes of the first test of primary jurisdiction, we believe the evidence is overwhelming that there is pervasive administrative regulation and control of the field of aviation. Within that scheme, the agency's determination of what is a "reasonable" landing fee is of central importance. See ante, at 167-69 for discussion regarding Sec. 511.
 
 
 91
 (2) and (3) Agency expertise and aid to the Court
 
 
 92
 Again, although we do not totally fault the district court, having the benefit of a fully developed record and a detailed analysis of the evidence by both the ALJ and the Secretary has certainly been of incalculable aid in "unravel[ing] intricate, technical facts." Mashpee Tribe, supra. There is no need to repeat what we have previously synthesized in this opinion. See ante at 162-66. Suffice it to say that these are the kind of issues in which the trees tend to obscure the forest. Agency expertise, even if late in coming, has been crucial to an appropriately distanced evaluation of the issues presented by these appeals.
 
 
 93
 Massport's argument to the effect that agency expertise is not a factor because the setting of landing fees is not within the area of regulation by the DOT, as per the Sec. 105(b) proprietary exception, misses the point. Even though there is no direct regulation of rate setting by the DOT, determination of what is a "reasonable" or "non-discriminatory" landing fee is, as we have seen under our discussion of Sec. 511, see ante at 168-169, subject to DOT's exclusive jurisdiction. Can it be seriously argued that Congress intended to promote one set of rules in the interpretation of Sec. 511 and another for Sec. 105? Although it is possible, we think it not likely, and until Congress expressly indicates otherwise, we are duty bound to interpret the national airspace regulation scheme in a logical and uniform fashion.
 
 
 94
 We thus conclude that the district court erred in not deferring to DOT the primary jurisdiction to interpret Sec. 105 of the Federal Aviation Act and the issues raised in these cases thereunder. We pass on to review the merits of the Secretary's ruling as it relates to Sec. 105.
 
 
 95
 In our opinion, considering the applicable standard of review previously stated, the Secretary's decision with regards to Sec. 105 is entitled to affirmance. 5 U.S.C. Sec. 706. The grounds given by the Secretary in concluding that the landing fees were unreasonable under Sec. 511 because of improper cost allocation methodology, ante at 165-66, are equally relevant to Sec. 105. The conclusions of the Secretary are supported by substantial evidence, 49 U.S.C.App. Sec. 1386(e), and are entitled to deference by this court. Chevron, supra. It appears beyond cavil that Massport could not pass a direct regulation prohibiting the use of Logan by small aircraft or decide upon the type of aircraft that could land there, or the times when such activities could take place. 49 U.S.C.App. Secs. 1304, 1348(a), 1508. Cf. American Airlines, Inc. v. Hempstead, supra. Can Massport do indirectly what it cannot do directly?
 
 
 96
 The Secretary is granted broad powers to "develop plans and formulate policy with respect to the use of the navigable airspace; and assign by rule, regulation, or order the use of the navigable airspace ... to insure the safety of aircraft and the efficient utilization of such airspace." 49 U.S.C.App. Sec. 1348(a). The Administrator of the FAA has taken specific action directed at airport congestion and delay by promulgating the so-called High Density Traffic Airport Rule, see 14 C.F.R. Sec. 93.121, at five designated airports. See 33 Fed.Reg. 17986, 17987 (Dec. 3, 1968). See also Northwest Airlines, Inc. v. Goldschmidt, 645 F.2d 1309, 1314 (8th Cir.1981). Logan is not one of these airports. Particularly when one considers the revenue neutral effect of PACE, the new landing fee regulations appear to be an attempt to modify conduct (e.g., control air traffic) rather than to recover operational costs, and are thus an incursion into an area of regulation preempted by Sec. 105(a). Massport cannot do indirectly what it is forbidden to do directly.
 
 
 97
 The district court's reliance upon Evansville-Vandenburgh Airport Authority District v. Delta Airlines, Inc., 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972), and Massport's urging of that case as setting the reasonableness and non-discrimination standards by which the new landing fee should be judged, is misplaced. The ruling of that case is merely that neither the Commerce Clause nor the Airport and Airway Development Act of 1970 precluded state or local authorities from assessing head taxes on air passengers boarding flights at state or local airports. Thus, Evansville is the precursor of the Anti-Head Tax Act previously discussed. See ante at 170. Because of its holding, Congress enacted that statute in 1973. The court said in Evansville:
 
 
 98
 No federal statute or specific congressional action or declaration evidences a congressional purpose to deny or pre-empt state and local power to levy charges designed to help defray the costs of airport constructions and maintenance.
 
 
 99
 Id. at 721, 92 S.Ct. at 1357 (emphasis supplied). Further, in stating the constitutional standard applicable under the Commerce Clause, the court indicated that:
 
 
 100
 [S]o long as the toll [charge] is based on some fair approximation of use or privilege for use ... and is neither discriminatory against interstate commerce nor excessive in comparison with the governmental benefit conferred, it will pass constitutional muster, even though some other formula might reflect more exactly the relative use of the state facilities by individual users.
 
 
 101
 Id. at 716-17, 92 S.Ct. at 1355.
 
 
 102
 It is obvious from the above that contrary to the district court's reading of Evansville, or the rule urged by Massport, that case does not establish a rule of general application. Evansville is the constitutional test when the commerce clause is the only basis for a challenge to local legislation. Where "specific congressional action" is the source of contention, we look to that source in determining whether it preempts the local legislation. New Orleans v. Dukes, 427 U.S. 297, 304, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976); Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 154-55, 102 S.Ct. 894, 910-11, 71 L.Ed.2d 21 (1982). There is no basis for concluding that Congress intended the general Evansville standard to be applied here, because it is inconsistent with the extensive and preclusive regulatory scheme for a uniform national aviation system previously described, and because it is counterproductive to granting exclusive administrative enforcement of Sec. 511 to DOT, as is agreed to by the district court and Massport.
 
 
 103
 In fact, if Evansville be further scrutinized it contains language that is more supportive of the Secretary's decision than that opposing it. In discussing the validity of the taxes in question and their reasonableness, the Supreme Court tells us that "the tax 'should be judged by its result, not its formula....' " Id. at 716, 92 S.Ct. at 1355 (quoting from Capitol Greyhound Lines v. Brice, 339 U.S. 542, 545, 70 S.Ct. 806, 808, 94 L.Ed. 1053 (1950)). Massport's arguments amount to a request that we ignore the results of the landing fees as irrelevant. The Court also tells us, in analyzing the rationality of the distinctions made by the head taxes as between the different classes of aircraft, that:Commercial air traffic requires more elaborate navigation and terminal facilities, as well as longer and more costly runway systems, than do flights by smaller private planes. Commercial aviation, therefore, may be made to bear a larger share of the cost of facilities built primarily to meet its special needs ... In short, distinctions based on aircraft weight or commercial versus private use do not render these charges wholly irrational as a measure of the relative use of the facilities for whose benefit they are levied.
 
 
 104
 Id. at 718-19, 92 S.Ct. at 1356. Massport's scheme seems to do exactly the opposite.
 
 
 105
 From all of the above, we resolve that the Secretary's conclusions to the effect that the new Massport landing fee scheme violates Sec. 105 are eminently correct.
 
 
 106
 Section 307 of the Federal Aviation Act of 1958, as amended
 
 
 107
 In these appeals Section 307 of the Federal Aviation Act of 1958[26] runs in tandem with Sec. 105, except that, in our view, the actions of Massport under its new landing fee scheme are even more clearly prohibited by this provision as an interference with air navigation. The new scheme, which, as we have stated, is revenue neutral, if not regulatory in purpose is at least conceded by all to be regulatory in effect. Cf. Evansville, 405 U.S. at 716, 92 S.Ct. at 1355. For the same reasons that we concluded that the district court should have deferred to the primary jurisdiction of DOT to rule upon the Sec. 105 issues, we hold that it should likewise have abstained from deciding the Sec. 307 controversy. We also affirm the Secretary's decision on the merits of the Sec. 307 issue on the same grounds.
 
 
 108
 The need for a cohesive, uniform national policy in the control of the country's airspace is clearly paramount. To allow parochial interests to overcome such concerns is to invite ungovernable checkerboard anarchy. Cf. American Airlines, Inc. v. Audubon Park, 407 F.2d 1306 (6th Cir.1969), cert. denied, 396 U.S. 845, 90 S.Ct. 78, 24 L.Ed.2d 95 (1969); American Airlines, Inc. v. Town of Hempstead, supra; Atlanta v. United States, 531 F.Supp. 506 (N.D.Ga.1982).
 
 
 109
 The exemption provisions of Massport's landing fee scheme
 
 
 110
 Although Sec. 105 of the Federal Aviation Act clearly invalidates the Massport exemption scheme, because we are dealing with a somewhat different topic within that general subject, it is appropriate that it be considered separately. The Massport exemption schedule has been detailed earlier in this opinion. Ante at n. 3. Suffice it to say that certain flights designated by Massport to be "essential air service hub operations" are exempt from payment of the new landing fees and only pay a minimum $25.00 landing charge.
 
 
 111
 The district court, sub silentio, approved this regulation. Ante at n. 16. The Secretary ruled that it runs contrary to Sec. 105 because it contravenes several of the provisions of the DOT's own EAS program. Again we conclude that the district court should have deferred to the administrative proceedings. And, as indicated previously, we affirm the Secretary's ruling invalidating the Massport exemption program.
 
 
 112
 Under this program Massport defines eligible communities and sets standards for the size of aircraft and frequency of air carrier service that will enable carriers serving such communities to qualify for the lower landing fees. Thus this program "has a connection with or reference to" rates, routes or services of air carriers. Shaw v. Delta Airlines, Inc., 463 U.S. 85, 96-97, 103 S.Ct. 2890, 2899-2900, 77 L.Ed.2d 490 (1983).
 
 
 113
 Massport's program deviates substantially from the federal EAS program. Section 419 of the Federal Aviation Act, 49 U.S.C.App. Sec. 1389, determines what communities are eligible for guaranteed essential air service, and DOT, pursuant to its EAS regulations, 14 C.F.R. Part 325, and its guidelines for EAS determinations, 14 C.F.R. Part 398, decides which EAS communities have Logan as their designated hub. The DOT has designated Boston as a required or permitted hub for 20 communities.
 
 
 114
 In contrast, Massport's program determines the points that are eligible and originally identified only 16 communities as eligible. At least one of these is not on the EAS program. Massport's program also has different standards for frequency of service and equipment to be used than does the EAS program.
 
 
 115
 Section 105 prohibits the exercise of discretion by local governments to control carrier rates, routes or services. Massport's exemption program clearly violates that prohibition.
 
 III.
 Other constitutional issues
 
 116
 In view of our rulings above, and in keeping with longstanding precedent that requires us to avoid ruling on constitutional issues when non-constitutional grounds are dispositive, we shall not pass upon the questions raised dealing with alleged independent violations of the Interstate Commerce Clause and the Equal Protection and Due Process Clauses.
 
 IV.
 Conclusion
 
 117
 It would be helpful if Congress would more clearly trace the areas of appropriate competence in this convoluted field and thus eliminate unnecessary conflict between judicial and administrative jurisdiction.
 
 
 118
 The decision of the district court is affirmed in dismissing those parts of the actions that are based on 49 U.S.C.App. Sec. 2210 and 42 U.S.C. Sec. 1983. All other rulings are reversed.
 
 
 119
 The Opinion and Order of the Secretary is affirmed.
 
 
 
 *
 The Honorable Edward D. Re, Chief Judge of the United States Court of International Trade, sitting by designation
 
 
 [1]
 Mass.Gen.L. ch. 91 App., Secs. 1-1 et seq
 
 
 [2]
 New York City and Denver are exceptions
 
 
 [3]
 The principal requirements to qualify are that the community involved be a market that/for:
 (1) has scheduled commercial passenger air service to Boston,
 (2) which Logan is designated as an essential air service airport hub by Department of Transportation or which, in Massport's opinion, Logan effectively serves as its only essential air service hub airport,
 (3) has no more than six scheduled passenger departures per day to Logan or which, due to its current certification, cannot permit aircraft operations with more than 30 seats and for which Part 139 (C.F.R.) certification requirements as an Index A airport will be completed within 12 months,
 (4) has no scheduled passenger jet service to Logan,
 (5) has no more than two air carriers providing scheduled passenger service to Logan,
 (6) is not within a thirty mile radius of Logan, and
 (7) has nonstop service to Logan in aircraft with no more than 56 seats.
 
 
 [4]
 A non-profit association of owners, operators and users of business aircraft with a membership of more than 5000 members
 
 
 [5]
 See 49 U.S.C.App. Sec. 1482 and 14 C.F.R. Part 13
 
 
 [6]
 A nationwide association with 264,000 members, of which 15,000 reside in the six New England states and 6,000 in Massachusetts, generally dedicated to promoting the aeronautical interests of its membership
 
 
 [7]
 A regional public interest law foundation which claims the use of small commuter airlines serving New England to service its clients in the area
 
 
 [8]
 A business organization with approximately 700 business members throughout the State of Vermont
 
 
 [9]
 Eastern Air Charter, Inc.; Montair Flight Service, Inc.; Ferns Flying Service, Inc.; and Alan Emerson d/b/a Emerson Aviation
 
 
 [10]
 Ciambro Corporation and C.M. Almy & Son, Inc
 
 
 [11]
 Associated Industries of Massachusetts, with approximately 2800 Massachusetts-based member firms, and Massachusetts High Technology Council, Inc., which has a membership of 160 member firms. Both associations indicate that many of their members own company aircraft that use Logan's facilities, or charter such services
 
 
 [12]
 The Federal Aviation Act, 49 U.S.C.App. Sec. 1305(a); the Federal Anti-Head Tax Act, 49 U.S.C.App. Sec. 1513(b); the Airport and Airway Improvement Act of 1982, 49 U.S.C.App. Sec. 2210
 13 U.S. Const. art. VI, cl. 2.
 14 U.S. Const. Art. I, Sec. 8.
 15 U.S. Const.Amend. XIV, Sec. 1.
 
 
 [16]
 Although the district court mentions, in the course of its oral opinion, the Massport exemption program established under Phase I, it made no specific findings in this respect. We must assume, however, that the outcome of its decision implies approval of this program
 
 
 [17]
 "General aviation" is defined as civil aviation that does not involve transportation for hire of passengers or cargo nor the ferrying of aircraft. See, e.g., 32 C.F.R. 766.2(c)(2); Mass.Regs.Code tit. 740, Sec. 21.24(1)(a)(i). Thus, general aviation typically includes use of private, small airplanes for recreation or personal business needs
 
 
 [18]
 By "opportunity" is meant opportunity to land to the exclusion of other aircraft
 
 
 [19]
 See 49 U.S.C.App. Sec. 1486(e)
 
 
 [20]
 49 U.S.C.App. Sec. 2210(a)(1):
 (a) Sponsorship
 As a condition precedent to approval of an airport development project contained in a project grant application submitted under this chapter, the Secretary shall receive assurances, in writing, satisfactory to the Secretary, that--
 (1) the airport to which the project relates will be available for public use on fair and reasonable terms and without unjust discrimination, including the requirement that (A) each air carrier using such airport (whether as a tenant, nontenant, or subtenant of another air carrier tenant) shall be subject to such nondiscriminatory and substantially comparable rates, fees, rentals, and other charges with respect to facilities directly and substantially related to providing air transportation and such nondiscriminatory and substantially comparable rules, regulations, and conditions as are applicable to all such air carriers which make similar use of such airport and which utilize similar facilities, subject to reasonable classifications such as tenants or nontenants, and signatory carriers and nonsignatory carriers, and such classification or status as tenant or signatory shall not be unreasonably withheld by any airport provided an air carrier assumes obligations substantially similar to those already imposed on air carriers in such classification or status, and (B) each fixed-based operator at any airport shall be subject to the same rates, fees, rentals, and other charges as are uniformly applicable to all other fixed-based operators making the same or similar uses of such airport utilizing the same or similar facilities, and (C) each air carrier using such airport shall have the right to service itself or to use any fixed-base operator that is authorized by the airport or permitted by the airport to serve any air carrier at such airport.
 
 
 [21]
 49 U.S.C.App. Sec. 1513 reads in part:
 (a) No State (or political subdivision thereof, ...) shall levy or collect a tax, fee, head charge, or other charge, directly or indirectly, on persons traveling in air commerce or on the carriage of persons traveling in air commerce or on the sale of air transportation or on the gross receipts derived therefrom; ...
 (b) Except as provided in subsection (d) of this section, nothing in this section shall prohibit a State (or political subdivision thereof, ...) from the levy or collection of taxes other than those enumerated in subsection (a) of this section, including property taxes, net income taxes, franchise taxes, and sales or use taxes on the sale of goods or services; and nothing in this section shall prohibit a State (or political subdivision thereof, ...) owning or operating an airport from levying or collecting reasonable rental charges, landing fees, and other service charges from aircraft operators for the use of airport facilities.
 
 
 [22]
 The prohibition is broader than just against head taxes. Aloha Airlines, Inc. v. Director of Taxation, 464 U.S. 7, 104 S.Ct. 291, 78 L.Ed.2d 10 (1983)
 
 
 [23]
 Whether there is standing by any private charging party to appeal the administrative ruling of the Secretary is an issue we need not decide. But see 49 U.S.C.App. Sec. 1486(a)
 
 
 [24]
 49 U.S.C.App. Sec. 1305 reads in part:
 (a) Preemption
 (1) Except as provided in paragraph (2) of this subsection, no State or political subdivision thereof and no interstate agency or other political agency of two or more States shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier having authority under subchapter IV of this chapter to provide air transportation.
 * * *
 (b) Proprietary powers and rights
 (1) Nothing in subsection (a) of this section shall be construed to limit the authority of any State or political subdivision thereof or any interstate agency or other political agency of two or more States as the owner or operator of an airport served by any air carrier certificated by the Board to exercise its proprietary powers and rights.
 
 
 [25]
 Although there is, in our opinion, a serious question whether a private cause of action exists under Sec. 105 of the Federal Aviation Act, see Air Transport Ass'n v. P.U.C. of State of Cal., 833 F.2d 200, 207 (9th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 2904, 101 L.Ed.2d 936 (1988); Montauk-Caribbean Airways, Inc. v. Hope, 784 F.2d 91, 97-98 (2d Cir.1986), cert. denied, 479 U.S. 872, 107 S.Ct. 248, 93 L.Ed.2d 172 (1986), this issue was neither argued below nor raised before us. The district court, relying on American Airlines Inc. v. Massachusetts Port Authority, 560 F.2d 1036 (1st Cir.1977), a pre-1978 Deregulation Act case, assumed that there was a private right to suit and decided the Sec. 105 issue on the merits. We shall follow suit
 
 
 [26]
 49 U.S.C.App. Sec. 1348 reads in part:
 (a) Use of airspace
 The Secretary of Transportation is authorized and directed to develop plans for and formulate policy with respect to the use of the navigable airspace; and assign by rule, regulation, or order the use of the navigable airspace under such terms, conditions, and limitations as he may deem necessary in order to insure the safety of aircraft and the efficient utilization of such airspace. He may modify or revoke such assignment when required in the public interest.